291 So.2d 541 (1974)
MISSISSIPPI POWER COMPANY
v.
MISSISSIPPI PUBLIC SERVICE COMMISSION.
No. 47749.
Supreme Court of Mississippi.
March 4, 1974.
*543 Watkins & Eager, Jackson, Eaton, Cottrell, Galloway & Lang, Gulfport, for appellant.
Bennett E. Smith, Perry, Phillips, Crockett & Morrison, Jackson, for appellee.
SUGG, Justice:
This is an appeal by Mississippi Power Company from a decree of the Chancery Court of the First Judicial District of Hinds County affirming an order of the Mississippi Public Service Commission disapproving proposed increases in rates projected to yield $2.6 million gross revenue.
Two questions are presented by this appeal; first, whether the order of the commission was supported by substantial evidence, and second, whether the commission lost jurisdiction to enter its order of November 21, 1972.
Mississippi Power Company is a subsidiary of The Southern Company, the other subsidiaries being Georgia Power Company, Gulf Power Company, Alabama Power Company and Southern Services, Inc. The company named last is a service company providing engineering, accounting, tax, marketing and other services for the operating subsidiaries. Southern Services, Inc. also supervises The Southern Company power pool agreement relating to the operation of the interconnected system of the operating subsidiaries of The Southern Company.
On July 31, 1972, Mississippi Power Company (MPCo.) was engaged in the generation, transmission, distribution and sale of electric energy in 23 counties in the southeastern part of Mississippi. It had in excess of 141,000 retail customers, employed 995 people, operated 4 steam generating plants, including an undivided 40% interest with Alabama Power Company in a 500 megawatt (500,000 kilowatts) generating plant in Greene County, Alabama. It also operated a combustion turbine station at the Standard Oil Refinery in Pascagoula that furnished a part of the electric service and steam requirements for the refinery. Mississippi Power Company has a combined electric capacity of 965,760 kilowatts, 2,196 miles of transmission lines and 3,701 miles of lower voltage lines. The peak hour demand on the system in August, 1972 was 1,070,000 kilowatts. It is estimated the peak hourly demand will be 1,772,000 kilowatts in 1977. Average annual consumption by residential customers grew from 1605 kilowatt hours per customer in 1951 to 9552 kilowatt hours on July 1, 1972. This was an increase in consumption from 26% below the national average to 26% above the national average. During the 1961-1971 period industrial use increased 280% and commercial use increased 143%.
*544 At the time of the hearing MPCo. was engaged in completing a 500 megawatt generating unit at Plant Jack Watson and planned construction of an additional plant in Jackson County north of Pascagoula with a 500 megawatt unit as the first unit of the new plant. The new plant was scheduled for service by the middle of 1976.
In order to meet the increased demand for electric services MPCo. estimates that within 5 years from the date of the hearing plant additions would amount to $275,000,000, an amount equal to the net plant that the company has accumulated in 47 years of operation. In order to raise the capital necessary for the huge expansion, it will be necessary to sell first mortgage bonds, preferred stock, and common stock in the amount of $79,000,000 during the years 1972 to 1974, $51,000,000 in 1975, and $28,000,000 in 1976. The total amount to be raised from these sources is $158,000,000.
The company historically has been able to generate about 50% of its capital requirements internally through retained earnings, depreciation, deferred income tax and other similar sources; however, in the years 1972 and 1973 the company estimates it will only be able to generate about 40% of its capital requirements.
As of March 31, 1972 the value of the utility plant, on a cost basis, in its operation was as follows:

 Gross plant 
 Excluding construction work and progress ............ $274,247,522.36
 Less accumulated provision for depreciation ......... 71,824,274.87
 _______________
 Net plant value ....................................... $203,413,247.49

The capitalization of MPCo. and the capitalization ratios for the years 1962, 1971 and the average and year end in 1972 are as follows:

 1972 
 1962 1971 Average Year-End
 CAPITALIZATION
 (OOO OMITTED)
 Long Term debt 48 987 110 406 122 258 134 109
 Preferred Stock
 and Premium 6 067 24 507 24 507 24 507
 Common Equity 32 304 70 727 77 531 84 336(1)
 ______ _______ _______ __________
 Total 87 358 205 640 224 296 242 952
 ====== ======= ======= ==========
 CAPITALIZATION
 RATIOS
 Long Term Debt 56.1 53.7 54.5 55.2
 Preferred Stock
 and Premium 6.9 11.9 10.9 10.1
 Common Equity 37.0 34.4 34.6 34.7
 _____ _____ _____ _____
 Total 100.0 100.0 100.0 100.0
 ===== ===== ===== =====

(1) Estimated without rate increase filed.
In Southern Bell v. Public Ser. Comm., 237 Miss. 157, 113 So.2d 622 (1959) the commission found that the capital structure of the company was imprudent and uneconomical, and unfair to telephone subscribers *545 because of its low debt ratio. The Court held that the commission had the right to adopt a hypothetical capital structure which would be less burdensome to the telephone subscribers for use in the determination of the earnings requirements of the company. In Sou. Bell, the opinion of the Court included this excerpt from the commission's order:
"During the test period, Southern Bell's capital structure appears to have been imprudent and uneconomical by reason of having an abnormally low amount of debt, the effect of which was to distort the true rate of return earned by the company under the rates prevailing during that period.
"The composition of a utility's capital structure affects its operating costs and earnings requirement, particularly under the current level of Federal income taxes. A prudent capital structure is one conducive to the lowest cost of service that is consistent with a sound financial posture.
"The record shows that Southern Bell's debt ratio, or the percentage of long-term debt in its total capitalization, had declined from 45.8% at the end of 1947 to 22.3% at December 31, 1955. During the test period, the debt ratio averaged 21.7%. While the company's debt ratio was thus declining, the debt ratios of the privately-owned electric utilities in the United States rose from 46.8% (composite) at the end of 1947 to 50.4% at December 31, 1954, and that of the natural gas companies advanced from 50.8% to 61.8% during the period (Hirsch Exhs. 14, 19). Moreover, at December 31, 1954, the privately-owned electric utilities has a composite of 12.4% of preferred stock in their capital structures and the natural gas companies 7.8%; but Southern Bell's capitalization is, without any preferred stock, an admittedly lower cost security than common stock. And during 1955, of all the new money securities issued by the electric and gas utilities, long-term debt constituted 59.5% and 71.6%, respectively, and preferred stock represented 15.5% and 9.4%, respectively. Between January 1 and June 30, 1956, these electric and gas utilities continued to obtain most of their new money requirements through the issuance of relatively low-cost debt securities instead of the much higher priced common stock capital. During this latter period, these utilities issued 63.9% and 77.9%, respectively, of long-term debt, in addition to 15.4% and 16.9%, respectively, of preferred stock (Hirsch Exh. 18). It is manifest that while the management of the electric and gas utilities have been seeking to reduce their overall cost of capital, a policy which benefits the rate-payers, the management of Southern Bell has been steadily increasing its overall cost of capital.
"* * *.
"From the standpoint of risk and stability of earnings, we are of the opinion that Southern Bell can safely carry as much long-term debt as is characteristic of the electric utility industry." (237 Miss. at 211, 212, 213, 113 So.2d at 641).
The Court stated with reference to a pro forma statement considered by the commission as follows:
The Commission incorporated in its opinion and order a pro forma statement of Southern Bell's intrastate capitalization under assumed debt ratios of 45 per cent and 50 per cent for rate-making purposes, and an analysis of Southern Bell's earnings under the intrastate telephone rates which were in effect during the test period, based on the current cost of debt and equity capital and the range of debt ratios which the Commission found to be fair and reasonable. The analysis showed that an increase in Southern Bell's debt ratio to 45 per cent would result in a reduction of $302,000 in the Company's Federal income taxes (based on the present corporate rate of 52 per cent), and a corresponding increase *546 in the Company's net operating income to $3,005,785, which was sufficient, after the payment of all interest obligations, to compensate the owner of the common stock on the basis of an earnings price ratio of 6.30 per cent, and to provide a cushion of $111,001 in excess of such compensation, or the equivalent of $258,000 in excess operating revenue. The Commission also pointed out in its opinion and findings that, if the above mentioned net operating income of $3,005,785 were divided by the rate base of $60,568,045, it would produce a rate of return of 4.96 per cent. In the same manner it was also shown that, with a 50 per cent debt ratio, the rate of return on the above mentioned rate base would be 5.08 per cent, and the excess earnings over dividend payments would be $202,713, or the equivalent of $471,000 in excess operating revenue. (237 Miss. at 214, 215, 113 So.2d at 642).
It is apparent from an examination of the capitalization ratios of MPCo. that the long term debt is slightly in excess of 50%, preferred stock is approximately 10% and common equity is approximately 35%. This constitutes a prudent composition of capital structure conducive to the lowest cost of service consistent with a sound financial position in accordance with the holding of this Court in Sou. Bell, supra.
MPCo. proposes to sell a minimum of $15,000,000 of first mortgage bonds and $5,000,000 in preferred stock in the first quarter of 1973.
One matter of concern to MPCo. is the question of coverages on bonds to be issued under the Federal Public Utility Holding Act, required by the Securities and Exchange Commission. Under Release No. 13105 the coverages are as follows:
The Indenture shall contain provisions which shall not be less favorable to the holders of the bonds than the following:
Issuance of Additional Bonds
(a) Additional bonds may be authenticated and delivered under the Indenture in a principal amount not in excess of
(1) a like amount of cash deposited with the Indenture Trustee;
(2) a like principal amount of retired bonds; or
(3) sixty per centum (60%) of the bondable value of net property additions;
provided that net earnings available for the payment of interest during any twelve (12) consecutive calendar months during the period of fifteen (15) calendar months immediately preceding the first day of the month in which application is made to the Indenture Trustee for the authentication and delivery of such additional bonds shall be at least equal to twice the annual interest requirements on all bonds authenticated and delivered under the Indenture and prior lien obligations which will be outstanding immediately after the authentication and delivery of such additional bonds.
Release No. 13106 issued by the Securities and Exchange Commission with respect to coverages on preferred stock is as follows:
(i) the gross income of the Corporation (after all taxes including taxes based on income) for 12 consecutive calendar months within a period of 15 calendar months immediately preceding the calendar month of such issuance is equal to at least 1 1/2 times the aggregate of the annual interest charges on indebtedness of the Corporation (excluding interest charges on indebtedness to be retired by the application of the proceeds from the issuance of such shares) and the annual dividend requirements on all preferred stock (including dividend requirements on any class of stock ranking prior to or on a parity with the shares to *547 be issued, as to dividends or assets), which will be outstanding immediately after the issuance of such shares;
Exhibit 13 shows the interest and dividend coverages for the period January 1, 1972 to December 31, 1972 as follows:

 Interest Coverage
 Income Before Interest Charges for the
 Period January 1, 1972-December 31, 1972 $19 484 770
 Income Taxes for this same Period
 (Accounts 409, 410, 411 and 411.1) 5 359 400
 ___________
 Total (Income Base) 24 844 170
 ===========
 Annualized Interest Cost of all
 Bonds Outstanding December 31, 1972 $ 8 252 840
 Estimated Interest cost of Bonds to be
 sold in First Quarter of 1973
 ($15,000,000 @ 7.75) 1 162 500
 ___________
 Total (Interest Base) $ 9 415 340
 ===========
 Interest Coverage (24 844 170 ÷ 9 415 340) 2.64 Times
 ====
 Interest and Dividend Coverage
 Income before Interest Charges
 for the Period January 1, 1972-December 31, 1972 $19 484 770
 ===========
 Total (Interest Base as per above) $ 9 415 340
 Dividends 1 563 750
 Estimated Dividends on Preferred Stock
 to be sold in First Quarter of 1973
 (5 000 000 X 8%) 400 000
 ___________
 Total (Interest and Dividend Base) $11 379 090
 ===========
 Interest and Dividend Coverage (19 484 770
 ÷ 11 379 090) 1.71 Times
 ====

MPCo. contends that coverages have reached the critical state because the preceding exhibit shows that interest coverages on bonds and interest and dividend coverages on preferred stock have declined as follows:

 Coverages
--------------------------------------------
 Interest
 and
 Year Interest Dividends
 1961 5.55 3.04
 1966 4.21 2.35
 1971 3.66 2.00

The matter of coverages has not been an item to be considered in rate cases until recent years because of the low imbedded cost figure of interest paid on first mortgage bonds and dividends paid on preferred stock. The increased cost of raising capital, as evidenced by increased interest cost and increased dividends, is a very real problem. It must be considered in fixing a rate for an operating utility because the rate must produce enough profit to enable it to maintain the coverages required; otherwise, bonds and preferred stock could not be issued as needed for expansion of facilities required to properly serve the certificated area of the utility.
Indicative of the importance of coverages would be the problem facing MPCo. if the 1971[1] rate increase of $3,000,000 *548 had not been allowed. Adjusting Exhibit 13 to reflect a decrease of $3,000,000 from the total income base with a corresponding adjustment of federal income taxes of 50% and state income taxes of 4% on the $3,000,000 would result in the following:

 Total Income Base 24 844 170
 Less 1970 Increase 3 000 000
 __________
 21 844 170
 Income Taxes (Adjusted) 3 739 400
 __________
 Income Before Interest Charges 18 104 770
 Interest Base 9 415 340
 Interest Coverage
 (18 104 770 ÷ 9 415 340) 1.95 times

Without the 1971 rate increase, interest coverage would be below the requirements of the Securities and Exchange Commission and MPCo. could not issue bonds in the first quarter, 1973, needed expansion of its facilities.
The testimony shows that a period of inflation has existed since 1939 and this inflationary trend enters into the cost of doing business. Some of the factors shown by the evidence in this case are hereafter set forth.
One of these factors is interest cost which has increased because of inflation. Exhibit 11 shows that interest cost has increased from 2 7/8% to 8 3/8%. The average imbedded cost of interest paid on first mortgage bonds was shown by the company to be 6.14% and by the commission's witness to be 6.11%. Either of these figures is lower than the rate that can be obtained on new bonds.
The cost of preferred stock outstanding at December 31, 1971 ranges from 4.40% to 8.44% giving an average net cost of 6.43% for preferred stock outstanding. Of course, MPCo. will have to pay at least 8% for any preferred stock that will be issued in the future in order to attract the buying public because dividends on preferred stock have increased with inflation.
Another increase is the cost of labor. In August, 1970 MPCo. completed a new labor contract with International Brotherhood of Electrical Workers which covers about 500 of the company's employees. This contract required an increase of wages of 7.5% the first year, 7.5% the second year, and in addition 1/4 of 1% of payroll in fringe benefits. Other employees salaries were increased similarly.
Materials and supplies have increased in cost as shown by the wholesale price index. The increase from 1939 to 1971 was from 100.00 to 286.2 and from 1970 to 1971 from 277.4 to 286.2.
Another example of increased cost is premium on fire insurance policies. In 1969 the company obtained a 3 year policy which was cancelled in November, 1970. The company had to renegotiate and as a result the new policy called for 112% increase in premiums and the amount deductible went from $25,000 to $100,000. The company therefore secured less coverage with increased premiums.
Environmental protection equipment required by both federal and state environmental agencies has added to the cost of doing business. In new plant construction the company is leaving spaces for environmental equipment that has not yet been perfected. Environmental facilities, even though they are very expensive, do not produce electricity, do not produce any operating revenue, but only produce increased operating costs.
*549 The investment per customer of MPCo. has increased as follows:

 1961 $ 873.00
 1970 $1,847.00
 1971 $1,940.00

This increase in the investment per customer has been brought about by the increased cost of doing business during the inflationary period which began in 1939 and has continued until the time of the hearing in this case.
It was against this background of factual evidence that MPCo. and the commission called two experts to testify. A summary of the testimony of these two experts as contained in the commission's brief is hereinafter set forth.
"(2) The Testimony of Dr. Morton[1a]
Dr. Morton began his testimony by stating that he had been called to testify on rate of return and cost of capital. As explained by Dr. Morton, the "fair rate of return" is a percentage figure to be applied to a rate base in order to get the actual earnings required by the company which is the "fair return". In arriving at a fair rate of return, Dr. Morton took into account, and quite properly so, the cost of debt, dividends on preferred stock, and the cost of common equity capital. (Ex. 19, Sch. 14, Vol. II, p. 308).
Inasmuch as the cost of debt and dividends on preferred stock are factors which are known for the past and reasonably ascertainable for the present, the principal variable in the total cost of capital is the cost of common equity. The crux of the testimony of Dr. Morton is, therefore, the method by which he arrived at his recommendations to the Commission that the Company should be allowed a return on common equity of 14.50%.
As stated by Dr. Morton at page 305, Vol. II of the record, "... the past operating costs of the Company are shown on the books and the near term costs can be projected, whereas the costs of capital and the fair return are matters for the fair and informed judgment of the regulatory body based on legal requirements, data, and experience."
Dr. Morton stated that the fair return in dollars is affected by the cost of capital and the value of money, and that from the viewpoint of the investor the rate of return should be such as will "fit the future". In addition, Dr. Morton stated that since we are now living, and for the immediate past have been living, in a period of inflation, and further since the Commission is using a net investment rate base, inflation should be allowed for in the rate of return. (Vol. II, pp. 310, 313, 315).
Dr. Morton sponsored a series of schedules (Exhibit 19) which reflect that since 1939 we have experienced a trend of inflation in the country, the gross national product has been increasing, and that utility stocks in general and the stock of The Southern Company in particular have declined in market value since 1966. During the same period the market value of industrials have increased. (See Schedules 1 to 5 of Exhibit 19, Vol. II, p. 309). Long term bond yields, particularly utility bonds, have generally increased from 1946 until they peaked in 1970 and are still generally high. This has resulted generally in an increase in the cost of debt and preferred stock issues of utilities. (Sch. 6-12, Ex. 19). The embedded cost of long term debt and preferred stock of Mississippi Power Company has increased according to the general trend. (Sch. 12, Ex. 19).
Dr. Morton stated that because of increased interest cost and inflation, and because of the poor performance of utility stocks as compared to other stocks, utility stocks have lost favor in the mind of the investor. The answer, he says, is an increase in the earnings on utility equity capital. *550 Otherwise, he says, the utility stocks will continue to decline in favor among the investment community. (Vol. II, pp. 315, 317).
When asked to define the cost of equity capital to a utility, Dr. Morton said that it was, "... the reasonable expectation of future earnings expressed as a percentage of equity capital." (Vol. III, p. 336). How is it determined? Dr. Morton says there are two basic methods and that in arriving at his conclusions he used both. The first is called "the investor approach", and the second is called "the alternative investment method". (Vol. III, p. 337).[2]
Using the first method, Dr. Morton concluded that increased earnings on utility common equity stocks in general and the common equity of Mississippi Power Company in particular is required. He arrives at this conclusion after finding that the comparable market value of utility equities are declining, supra, and that the ratio of market value to book value of utility equities are declining. From 1956 to 1971, the market value to book value ratio of selected utility equities declined from 235% to 128%, while industrials were doing much better. In 1971, while selected utility equities were selling at 1.28 times book, selected industrials were selling at more than twice book. (Vol. III, p. 340). The stock of Southern Company in 1971 was selling at 1.11 times book value.
The investor approach method of determining cost of equity, thus, led Dr. Morton to the conclusion that higher earnings on equity are required. (Vol. III, p. 355). He then applied the alternative investment method.
Beginning with the premise that the present yield on unspecified fixed income securities are higher than the divided on unspecified utility common stocks, Dr. Morton says that the alternative investment opportunities to such common stock as Mississippi Power Company are the whole gamut of corporations having publicly held common stocks. Dr. Morton attached primary weight to the earnings on the common stock equity of the unregulated industrial companies. Moody's industrials, for example, earned 13.5% on equity during the 1965-69 period on a much higher equity ratio.[3] (Vol.III, p. 359).
Taking these factors into consideration, Dr. Morton was of the opinion that the Commission should allow Mississippi Power Company a return on equity capital of 14.5%. (Vol.III, p. 361).[4] Using the capital structure of Mississippi Power Company as of December 31, 1971 and December 31, 1972, and taking into account the costs of debt at December 31, 1971 and December 31, 1972, the composite cost of capital or the recommended rate of return would range from 8.81% to 9.06% (Sch. 14, Ex. 19). Dr. Morton recommended 9.06%. (Vol. III, p. 364)."
"(3) The Testimony of Mr. Bernstein
As previously stated, Mr. Edgar Bernstein,[5] a consultant from Washington, D.C., was employed by the Commission to analyze the cost of capital applicable to Mississippi Power Company and to submit his findings and conclusions to the Commission including a recommendation as to the fair rate or return applicable to the Company's rate base.
Mr. Bernstein testified that in his opinion a fair rate of return was that which "... will provide earnings sufficient to (1) pay all interest on debt; (2) pay the dividends on preferred stock, if any; *551 (3) provide the common stockholders with a reasonable dividend; and (4) leave something over and above these for surplus to take care of future contingencies and reinvestment in the business ...", and that the total costs of capital is determined by making an analysis of its three components, debt, preferred stock, and equity. A combination of these three components, based upon a proper capital structure for the company, should approximate a fair rate of return for a particular company. (Vol. IV, p. 595). Thus, in arriving at a fair rate of return for the company, Mr. Bernstein used the same method employed by Dr. Morton, i.e., a determination of the costs of capital. (Vol. IV, p. 604).
In arriving at the cost of capital, Mr. Bernstein first analyzed the cost of debt. He determined the cost of long term debt to be 6.11% by using the present average cost of all outstanding debt issues of the company.[6] (Vol. IV, p. 595, 607, Vol. V, p. 637).
The figure of 6.11% for total costs of debt was deemed by Mr. Brenstein to be accurate and reliable because the company planned no further debt issues for 1972 (Vol. IV, p. 607), and because yields on utility debt issues had generally declined from the peek 1970 period to the date of hearing.[7]
Having determined the cost of long term debt, Mr. Bernstein then analyzed the interest cost of preferred stock. The cost of preferred stock was determined by using the current average net costs of all outstanding preferred issues. This was determined to be 6.43% (p. 6, Ex. 29, Vol. V, p. 642).[8] This figure was used because the company planned no further issue of preferred during the year and because yields on utility preferreds were also generally declining.[9] (Vol. IV, pp. 607, 608).
Mr. Bernstein then proceeded to determine the cost of equity. He stated that the cost of equity may be considered from the basis of two items, (1) the earnings-price ratio, or (2) the divided-price ratio. Mr. Bernstein elected to use the earnings-price ratio, which is the earnings per share obtained by the investor in relation to the average market price of the common stock.
The earnings-price ratio was used because utility common stocks are bought primarily for their earnings rather than for speculation purposes. While he may hope for and expect an appreciation in value, the investor is primarily interested in the earnings of the company and the dividends which those earnings will provide. Having determined to invest in the utility, after considering relative risks and relative investment opportunities, the cost to the investor of the share of earnings to which he is entitled is the ratio between those earnings and the price he pays. (Vol. IV, p. 609).
In using earnings-price ratios as a method of determining the cost of equity, Mr. Bernstein selected the period 1962-1971, inclusive. This period was selected because it appeared, from an economic viewpoint, to be representative of general economic conditions in the country as a whole and in the money markets. (Vol. IV, pp. 610-612). He then selected companies to be analyzed upon the basis of certain comparables with Mississippi Power Company and its parent, The Southern Company. Using the criteria *552 set forth at Vol. IV, page 613 of the record, thirteen electric operating companies[10] and five holding companies were selected. (See p. 8, Ex. 29, Vol. V, p. 644). Mr. Bernstein also used Moody's 24 electric utilities.
For the period indicated the Southern Company had an average earnings-price ratio of 5.62% (Vol. V, p. 645), the thirteen operating electrics had an average earnings-price ratio of 6.65%[11] (Vol. V, p. 650), the five utility holding companies had an average earnings-price ratio of 6.32%[12] (Vol. V, p. 652), and Moody's 24 electric utility companies had an average earnings-price ratio of 6.44%. (Vol. V, p. 653).
The price-earnings ratios thus determined were then adjusted as follows: In each instance there was an adjustment upward[13] of 10% for costs of financing and pressure. The cost of financing involves certain expenses which a company incurs in securing equity capital such as legal fees, printing, clerical and administrative costs, and under-writing commissions. Since the effect of these legitimate "costs of equity capital" are not reflected in earnings-price ratios, an adjustment was made for them.
Pressure, as explained by Mr. Bernstein, is the measurement of the downward movement of stock prices below market levels after adjusting for stock price trends during the offering period. This adjustment compensates for the lower market prices resulting from an increase in the supply of stock and the lag in productivity of the proceeds of an equity issue. (Vol. IV, pp. 616, 617).[14]
Mr. Bernstein made a further adjustment (upward) of 25% to allow for future growth in earnings and to insure that the earnings level would be sufficiently high to enable the market price of the common stock of the company, as though it were not wholly owned, to maintain a reasonable margin above its book value. (Vol. IV, p. 619; Vol. V, pp. 709, 710).[15]
Due to abnormalities which have occurred in the stock market during the past few years, Mr. Bernstein then compared the earnings-price ratios of the same group of companies using data for the years 1968-1971. The result was 7.01% for the Southern Company, 7.97% for the 13 electrics, 7.49% for the 5 holding companies, and 7.91% for Moody's 24 electrics. When the same two adjustments were applied (10% and 25%) the figures became 9.74% for the Southern Company, 11.08% for the 13 electrics, 10.40% for the 5 holding companies, and 10.99% for Moody's 24 electrics. (Vol. IV, pp. 622-623).
Mr. Bernstein then considered the actual cost of equity capital incurred by the Company for the year 1971. The range was 7.84% to 9.06%. (p. 13, Ex. 29, Vol. V, p. 654).
Based upon the foregoing comparables, and applying his own judgment and experience, Mr. Bernstein recommended to the Commission an allowance for cost of equity of 11% to 11.5%. When applied to the average capitalization of the Company for 1971 and 1972, the result was a recommended *553 composite cost of capital of 7.61% to 7.91%. (p. 15, Ex. 29, Vol. V, p. 656; also Vol. IV, pp. 626-627). Based upon the foregoing cost of capital, Mr. Bernstein recommended a rate of return of 7.75% to 8.00%. (Vol. IV, p. 627).[16]"
The commission's witness agreed that a utility must continue to invest to meet the demands of the public regardless of rising costs and inflation whereas non-regulated businesses may simply defer further construction to a more favorable time. The witness explained that the utility, because of the authority granted to it by the legislature or the commission, has a duty to serve. It is a public entity as such and has a franchise to serve an area, and a monopoly to serve that area, and it is protected by the commission to the best of the commission's ability from losses.
With respect to the requirements of decisions by the United States Supreme Court and the Supreme Court of Mississippi pertaining to the rates a public utility is entitled to, the following questions were propounded and answers given by the witness:
Q You do know that the Supreme Court of Mississippi requires that a public utility be entitled to such rates as will permit it to earn a return equal to that of investments in other business undertakings which are attended by corresponding risks. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. Do you know that to be the announcement of the rule in Mississippi?
A No, I don't know that to be, but it is the same ruling that the Supreme Court of the United States came out with in the Hope case with unfortunately on the part of the justices a very nebulous worded decision saying that comparable returns should be allowed and not defining what comparable means, nor saying what the investment base is. Now, when the investor decides to buy common stock, he pays for that stock in the market the price demanded by the seller, either the selling company or a selling stockholder, which normally is not equal the book value. Now, if you are going to give him a return on his investment, that is a return on the price he paid for it, and not the book value of the stock.
......
Q Well now, just last year in the Alabama rate case you refused to accept the definition laid down by the Courts and insisted on using an economic definition that you use, didn't you?
A As an economist, yes, I believe cost is defined one way as is already in this record.
Q So you then and now use an economic definition and refuse to use the legal definition laid down by the Courts of Alabama and Mississippi?
A I don't refuse to use any such thing, Mr. Watkins. I determine a cost based upon economic concepts. If they agree with the legal principles established by this Commission and the Courts of this state, then my definition fits if the Commission agrees.
The witness then stated that he believed his economic definition and the results achieved by using it met the requirements of the courts. His testimony was as follows:
All I am saying is that in the Hope case, and as set forth in similar language by the Supreme Court of the State of *554 Mississippi, the Justices unfortunately did not define what they meant. They set forth no guidelines and therefore it is to this Commission or their experts in the field to determine what is comparable. All I am saying is what I have done, the basis that I have used, meets the criteria.
In its brief the commission stated that if the commission had accepted the recommendation of Dr. Morton it would have approved higher rates than those requested by the company, but if it had accepted the recommendation of Mr. Bernstein it would have reduced existing rates. The brief then states that the commission was not bound to do and did not do either. Unfortunately the basis of the commission's decision does not appear in its order.
At the conclusion of the hearing the Public Service Commission rendered its order on November 21, 1972, without making a detailed finding of facts, but disposed of the proposed rate increase in the following language:
The proposed increased rates and charges are unjust, unreasonable, and in violation of the law, and the same should be set aside, and Mississippi Power Company is authorized to continue to collect the rates and charges lawfully in effect on May 31, 1972.
IT IS THEREFORE ORDERED that the proposed change in rates and charges herein filed and requested by Mississippi Power Company be and the same is hereby denied.
The courts in many jurisdictions have recognized that the question of rate making is one to be properly resolved by a specialized body having expertise in the rate making field. Recognizing this premise, the Public Service Commission in fixing rates should evidence its expertise by incorporating in its order cogent reasons for its decision based on a finding of facts pertinent to the particular inquiry before it. Such order should set forth the basis on which the rates are fixed in accordance with the law applicable thereto; otherwise, courts are seriously hampered in the review of such order.
We have had occasion in Fortune Furniture Mfg. Co., Inc. v. Sullivan, 279 So.2d 644 (Miss. 1973) and in Rivers Construction Co. v. Dubose, 241 Miss. 527, 130 So.2d 865 (1961) to comment on the failure of administrative boards and agencies failing to make a finding of fact. In Fortune, we stated:
This is another one of those cases in which this Court is handicapped in its effort to perform the function of an appellate court, because of the lack of facts stated in the order of the administrative agency on which its finding is predicated.
......
We said in Rivers Construction Company v. Dubose, 241 Miss. 527, 130 So.2d 865 (1961) that the failure to make a finding of fact was not fatal to an informal order of the Commission, but, at the same time, we said:
"The great weight of authority holds it to be better form for a fact finding administrative agency or commission to make a finding of facts on which to base an award or reject a claim." (Citing cases). 241 Miss. at 536, 130 So.2d at 869.
This rule is almost universal. 58 Am. Jur. Workmen's Compensation §§ 471-472, at 877-878 (1948); 100 C.J.S. Workmen's Compensation § 631(a)(b) (c), at 913-923 (1958); 3 A. Larson, The Law of Workmen's Compensation § 80.20, at 268 (1971).
We have repeatedly held that the Workmen's Compensation Commission is the trier of fact. The Commission is the judge of the weight and worth of the evidence. In a case where the evidence is adverse to the order of the Commission, unless the Commission makes a finding of fact, the reviewing court is placed in *555 the awkward position of trying to ferret out sufficient evidence from the record to avoid holding that the order of the Commission is arbitrary and capricious, or that it is based on substantial evidence. (279 So.2d at 646-647).
The comment in these two cases applies with equal force to findings of the Public Service Commission. It is apparent from the decision of this Court in the Sou. Bell, supra, and in Miss. Pub. Serv. Comm. v. Home Tel. Co., 236 Miss. 444, 110 So.2d 618 (1959), detailed findings of fact were incorporated in the orders thus enabling the reviewing courts to know with certainty the basis of the decision of the commission.
We next consider the law that must be applied to the facts as shown by the record. As noted in Sou. Bell v. Public Ser. Comm, 237 Miss. 157, 113 So.2d 622 (1959) for more than 60 years a controversy over the proper rate base of a public utility has filled the books with conflicting decisions. This Court then stated:
Finally, in the case of Federal Power Commission v. Hope Natural Gas Company (1944) 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333, the Court radically altered the course of utility regulation by holding that under the statutory standard of "just and reasonable", it is the end result reached, not the method employed which is controlling, and that the Commission could constitutionally use an original cost rate base. The Court in its opinion in that case said: "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." The effect of the decision in the Hope case was to free the state commissions as far as the Federal Constitution was concerned from any restriction in their choice of a rate base. Many state courts and commissions turned from fair value to original cost, although elsewhere fair value continued as the accepted rate base, not because of Federal constitutional requirements but because of state law. (237 Miss. at 224, 113 So.2d at 647). (Emphasis supplied).
The Court then stated that the Mississippi Legislature, by the enactment of Chapter 372, Laws of 1956, [Miss. Code Ann. § 77-3-33 (1972)][17] did not intend to impose upon the commission a requirement of the "fair value" formula with emphasis upon reproduction costs as a measure of value in determining the reasonable value of the utilities proper for rate making purposes. The Court further held that if evidence of reproduction cost, less depreciation, is admitted in the hearing in a rate case, its probative value must be determined by the commission.
One of the questions concerned in Sou. Bell was the company's contention that, for the purpose of rate making, the property should be valued at present value, rather than at original cost less depreciation, thus *556 increasing the value to be considered by the commission for rate making purposes. The commission also excluded from the rate base items for telephone plant under construction, materials and supplies and cash requirements. These exclusions were approved by this Court. The Court then announced that the rates of a public utility were not to be determined by any definite rule or legal formula in this language:
The reasonableness or unreasonableness of the rates charged, or to be charged, by a public utility for its service or product is not to be determined by any definite rule or legal formula, and is not measurable with any great degree of exactness, but is a question of fact calling for the exercise of sound discretion, good sense, and a fair, enlightened, and independent judgment. In determining whether a rate is reasonable, each case must rest on its special facts. 73 C.J.S. Public Utilities § 25a, p. 1032, and cases cited. (237 Miss. at 238, 113 So.2d at 654).
The Court also quoted from Bluefield Water Works and Improvement Co. v. Public Service Commission of State of West Virginia, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The portion of the opinion discussing the rate of return which will constitute just compensation to a public utility was quoted as follows:
"What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties. A rate of return may be reasonable at one time and become too high or too low by changes ffecting opportunities for investment, the market and business conditions generally." (237 Miss. at 239, 113 So.2d at 654).
The Court also cited with approval Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), and quoted from it as follows:
"The rate-making process under the Act, i.e., the fixing of `just and reasonable' rates, involves a balancing of the investor and the consumer interests. Thus we stated in the Natural Gas Pipeline Co. case [Federal Power Commission v. Natural Gas Pipeline Co.] that `regulation does not insure that the business shall produce net revenues.' 315 U.S. 575 p. 590, 62 S.Ct. 736, 86 L.Ed. 1037. But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. Cf. Chicago & Grand Trunk Ry. Co. v. Wellman, 143 U.S. 339, 345, 346, 12 S.Ct. 400, 36 L.Ed. 176. By that standard the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *557 (237 Miss. at 240, 241, 113 So.2d at 655). (Emphasis supplied).
The Court then laid down the following rule with reference to rates of public utilities:
What appellant in this case is entitled to is "just and reasonable" rates which will yield "a fair rate of return" to the appellant upon the reasonable value of the property used or useful in furnishing service. A fair return is one which, under prudent and economical management, is just and reasonable to both the public and the utility. From the standpoint of the Company it is important that there be enough revenue not only for operating expenses but also for the capital cost of the business, which includes service on the debt and dividends on the stock. By that standard the return to the equity owner should be commensurate with returns on investments and other enterprises having corresponding risks and sufficient to assure confidence in the financial integrity of the business. What the public is entitled to demand is that no more be exacted from the rate payers that the services are reasonably worth. (237 Miss. at 241, 113 So.2d at 656).
The Court also pointed out that a rate determined solely on the value of the property used by the utility would be meaningless unless it is correlated with the other factors related to the rate structure.
The effect of Sou. Bell, supra, is that the rate of a regulated public utility is not to be established by an arbitrary percentage of the value of the property used by such utility in its operation as the sole basis for a rate. Rates should be fixed by taking into consideration the value of such property along with such other factors as operating expenses, service on debt, capital costs and capital structure under prudent and economical management. Another fact for determination is whether the revenue produced by such rate will enable the utility to secure additional funds for expansion of facilities needed to serve its certificated area, and, at the same time, enable it to maintain coverages required by law as previously discussed in this opinion.
As heretofore noted one of the reasons Sou. Bell was denied a rate increase was because of the low long term debt and the absence of preferred stock in its capital structure. The Court held this was imprudent and uneconomical, but such is not a fact in the case at bar.
Except for the difference of the opinion of the rate experts, the facts in this case are not in dispute. The MPCo., at the time of the hearing, used property in its operation having a value of in excess of $203,000,000; within the next five years MPCo. will be required to spend $275,000,000 for additional plant facilities in order to properly service its certificated territory; that, like all other corporations and individuals, MPCo. has been operating in an era of inflation that has existed since 1939; that the coverage required by the Securities and Exchange Commission on its first mortgage bonds have declined until with the issuance of $15,000,000 of first mortgage bonds in the first quarter of 1973 it will be near the minimum requirement; that if a rate increase of $3,000,000 had not been granted in 1971, the interest coverage would not be sufficient to authorize the issuance of the $15,000,000 in bonds contemplated in the first quarter of 1973; that the rate increase is necessary to enable MPCo. to maintain its interest coverage so that additional bonds needed for expansion can be issued; that the dividend and interest coverage on preferred stock to be issued in the first quarter of 1973 has declined to the point that it is only .21 above the minimum requirement; that although the average indebted cost of debt is 6.11%, additional first mortgage bonds cannot be sold for that low rate of interest; that although the average dividend on preferred stock is 6.43%, preferred stock cannot be issued at the same rate in 1973; that the cost of labor, materials and supplies, insurance and other operating costs *558 have increased; that the ratio of common stock, preferred stock and long term debt are prudent and economical; that the records of the MPCo. are kept in accordance with the requirements of the commission and reflect with accuracy the earning and financial condition of the company, and, that the rate increase of 4.3% estimated to yield additional revenue of $2,600,000, is just and reasonable when all the facts discussed herein are considered together.
Since the only major conflict in evidence was the difference of opinion of the two rate experts, and since the commission did not follow either rate expert and did not make a finding of fact to support its ultimate conclusion, we hold that the order of the commission was not supported by substantial evidence and was against the manifest weight of the undisputed evidence. We therefore vacate the order of the commission.
Miss. Code Ann. § 77-3-67 (1972) provides for the disposition of cases on appeal as follows:
The court may hear and dispose of the appeal in term time or vacation and the court may sustain or dismiss the appeal, modify or vacate the order complained of in whole or in part, as the case may be. In case the order is wholly or partly vacated the court may also, in its discretion, remand the matter to the commission for such further proceedings, not inconsistent with the court's order as, in the opinion of the court, justice may require. The order shall not be vacated or set aside either in whole or in part, except for errors of law, unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights.
In Miss. Pub. Serv. Comm. v. Home Tel. Co., supra, the chancery court reversed the commission's findings that salaries paid to the president and treasurer of the company in that case were excessive and unreasonable. This action was approved by this Court on appeal. The commission disallowed items slightly in excess of $25,000 incurred by the company for past losses which it sought to amortize over a 10 year period. The chancery court reduced the sum to $14,000 to be amortized over a 10 year period. This Court reversed the chancery court on that finding.
The commission also disallowed $25,000 plus which represented the undepreciated value of a plant which was abandoned by the company. The chancery court reversed as to this item and on appeal this Court reversed the chancery court reinstating the order of the commission.
In that posture of the case the chancery court then fixed a rate return and this Court stated:
The chancery court erred in fixing a rate of return. The function of rate making is purely legislative in character. It is not within the power of a court to fix the rates to be charged by public utilities, although a court may restrain the imposition of confiscatory rates or, under the Public Utility Act, determine whether the rates as fixed are supported by substantial evidence or within the other statutory restrictions set forth in Code Sec. 7716-26, 43 Am.Jur., Public Utilities and Services, Sec. 83, pages 185-191. So that part of the decree fixing a rate of return for appellee is reversed. (236 Miss. at 461, 110 So.2d at 626).
Clearly the chancery court was fixing a rate, but we do not deem it necessary to remand this case to the commission because we have determined that the order of the commission denying the rate increase requested by MPCo. was not supported by substantial evidence and amount to the imposition of confiscatory rates which may be restrained by this Court.
*559 The second question for consideration is whether or not the commission lost jurisdiction to enter its order of November 21, 1972. The procedural history of the case shows that MPCo. filed notice of change in rates on May 31, 1972, such change to become effective July 1, 1972. On June 6, 1972, the commission entered an order suspending the rate increase for a period of 90 days and set a date for hearing. On August 29th the case was continued by order of the commission for further hearing on October 9th and 10th.
The original 90 day suspension was to expire on September 25, 1972. On September 25, 1972 the commission apparently adopted an order extending the suspension of rates; however, this order was not recorded in the minutes and was not docketed until October 12, 1972. On October 9 and 10th further hearings were conducted and at the conclusion of the hearings it was agreed that the commission would reconvene for further hearings on November 9th. This was agreed to by counsel for MPCo.
On October 12th MPCo. filed a motion to terminate the proceedings which order was overruled by the commission. On November 9th the hearing was continued until November 14th when rebuttal testimony was taken by MPCo. and the final order was entered on November 21, 1972.
MPCo. contends that under Miss. Code Ann. § 77-3-39 (1972) the commission was without jurisdiction to enter its order on November 21st because the original suspension of rates was for a period of 90 days and the time was not extended by order on the minutes of the commission before the expiration of the 90 days.
We hold that the continuance order on August 29, 1972, continuing the cause for hearing past the date of the original 90 days suspension order was sufficient notice to the company that the rates were suspended until the hearing could be held. Otherwise, there would be no necessity for having the hearing. The company appeared and engaged in hearings on October 9th and 10th without objection.
The commission may not, under Miss. Code Ann. § 77-3-39 (1972) extend the time for hearing beyond the six months prescribed by the statute; otherwise, it would lose jurisdiction to suspend rates and complete the hearing. This is admitted by the commission in its brief; however, this would not affect the power of the commission to review the rates because under Miss. Code Ann. § 77-3-41 (1972) the commission may, on reasonable notice, determine just and reasonable rates.
For the reasons stated, this cause is reversed, the order of the commission is vacated, and the rate schedule filed by MPCo. is approved effective July 1, 1972.
Reversed and order of Commission vacated.
RODGERS, P.J., and PATTERSON, SMITH and ROBERTSON, JJ., concur.
NOTES
[1] In 1971, the commission, pursuant to a decree of the Chancery Court of Hinds County, approved an increase in rates for Mississippi Power Company of $3,000,000.00.
[1a] Dr. Morton's qualifications as an expert economist are outlined beginning at page 302, Vol. II.
[2] Although he used both methods, Dr. Morton gave predominate weight to the latter method. (Vol. III, p. 338).
[3] Moody's industrials include such "high flyers" as IBM, Texas Gulf and Burrough Corp., and such "conservatives" as U.S. Steel, Standard Oil and Coca Cola.
[4] The validity of the conclusions of Dr. Morton appear to depend upon the validity of the assumption that one may measure the mind of the investment community.
[5] Mr. Bernstein's qualifications as an expert economist appear beginning at p. 592, Vol. IV.
[6] The cost of debt figure used by Mr. Bernstein was slightly higher (and more favorable to the company) than the figure used by Dr. Morton. (See Sch. 14, Ex. 19, Vol. II, p. 308).
[7] Page 4 of Ex. 29 (Vol. V, p. 640), reflects that yields on Moody's Public Utility A rated bonds (MPC bonds are rated A) generally declined from 9.06% in June of 1970, to 7.64% in August of 1972.
[8] The cost of preferred was slightly higher (and more favorable to the Company) than the figure used by Dr. Morton. (Sch. 14, Ex. 19, Vol. II, p. 308).
[9] As in the case of debt issues, the yield on Moody's Utility Preferreds had generally declined since 1970. (p. 7, Ex. 29, Vol. V, p. 643).
[10] Appellant, in its brief, criticizes Mr. Bernstein for not including Mississippi Power & Light Co. in his group of comparative companies. MP & L is a wholly owned subsidiary of Middle South. Its stock has no public market and earnings-price ratios thereon are thus not available.
[11] The range was 4.33%-7.93%.
[12] The range was 5.24%-7.32%.
[13] In this and subsequent adjustments, the adjustment is upward, i.e., in favor of the Power Company.
[14] The adjusted earnings-price ratios thus became: Southern Company, 6.24%; 13 electrics, 7.39%; 5 holding companies, 7.02%; and Moody's 24 electrics, 7.16% (Vol. IV, p. 618).
[15] The adjusted earnings-price ratios thus became: Southern Company, 7.80%; 13 electrics, 9.24%; the 5 holding companies, 8.78%; and Moody's 24 electrics, 8.95%. (Vol. IV, p. 619).
[16] The earnings of the sister companies of Mississippi Power Company (other operating subsidiaries of The Southern Company) for the year 1971 were as follows: Alabama Power earned 11.365% on equity and 7.532% on total capital; Georgia Power earned 8.529% on equity and 6.981% on total capital; and Gulf Power earned 16.844% on equity and 8.294% on total capital. (Ex. 31, Vol. V, p. 660).
[17] Miss. Code Ann. § 77-3-33 (1972). Rates, Classifications and service of utilities.

(1) No rate made, deposit or service charge demanded or received by any public utility shall exceed that which is just and reasonable. Such public utility, the rates of which are subject to regulation under the provisions of this article, may demand, collect and receive fair, just and reasonable rates for the services rendered or to be rendered by it to any person. Rates prescribed by the commission shall be such as to yield a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service.