ROBERTSON, Justice:
The Mississippi Public Service Commission has appealed from the decree of the Chancery Court of the First Judicial District of Hinds County, Mississippi, which decree reversed the order of the Commission denying any rate increase and approved the schedule of rate increases requested by the Mississippi Power & Light Company.
The Company filed with the Commission on January 17, 1974, its schedule of proposed rate changes, a statement of the necessity for the proposed changes, and detailed supporting data, as required by Mississippi Code Annotated section 77-3-37 (1972). As provided in Section 77-3-39, the Company posted a refunding bond and placed the new rates into effect on February 17, 1974.
As a part of its overall proposal to the Commission, the Company included a new fuel adjustment clause.
In its order of July 12, 1974, the Commission denied the Company any rate increase, but approved the use of the proposed new fuel adjustment clause, except insofar as it would roll into the base rate 4.5 mills per KWH of fuel cost.
In its written opinion, the chancery court found:
“[T]hat the order of the Commission denying the rate increase requested by the Company but approving the fuel adjustment clause which had been coupled to the rate schedule sought to be approved, was not supported by substantial evidence and in fact was against the overwhelming weight of the creditable evidence in the case. .
“ . . . the schedule of rates sought to be approved by the Company together with its proposed fuel adjustment clause is reasonable, taking into consideration all of the circumstances prevailing, and will provide the company with a fair return.”
In reasoning out its ultimate findings, the lower court said in part:
“It was proposed by Mississippi Power & Light Company (the Company) that the new schedule of rates proposed would yield additional income in the amount of some 9.7 million dollars, but that this would be offset by a reduction in income by virtue of the new fuel adjustment clause which would decrease revenues in the amount of 6.877 million dollars, leaving than a net increase of some 2.823 million dollars.

“This Court is of the opinion that the Commission failed to grasp the significance of the fact that the fuel adjustment clause proposed by the Company was coupled with and based on the proposed rate increase. The effect of the Commission’s ruling is to actually reduce the net utility operating income below what it has been in the past.”
On November 10,1975¡ the Company filed with the Commission a new notice of intention to change rates, pursuant to Mississippi Code Annotated section 77-3-37 (1972). The notice stated that the Company proposed to put the new rates into effect on December 11, 1975, and after posting a proper bond these new rates were put into effect.
On May 6,1976, the Commission issued its detailed order allowing the Company to collect additional revenue of approximately *771 $19,550,000 each year. Because the Commission’s order found that the Company was entitled to rate increases to yield $19,-550,000 more than the rates of February 17, 1974, were yielding, the Company, on May 11,1976, filed in this Court a Plea in Bar in which it contended that the Commission in its May 6, 1976, Order reversed its previous position and in effect confirmed and approved the Chancellor’s decision from which the Commission was appealing. The Company argued in the Plea in Bar that the questions raised on this appeal were now moot.
While it could be argued by the Company with some validity that the Commission indirectly and impliedly approved the February 17, 1974, rates in its Order of May 6, 1976, the Commission could counter this argument by contending that the two cases (the one filed on January 17, 1974, and the other on November 10, 1975) were entirely different, based on different facts and circumstances and even filed almost two years apart, and that it had to start from the base of revenues then being produced by rates presently in effect in order to make clear what increase it was approving.
We prefer to decide this case on its merits, rather than on the premise that the Commission, in its order of May 6, 1976, impliedly approved the February 17, 1974,. rates. The Plea in Bar is, therefore, denied.
We agree with the lower court that the Commission failed to grasp the significance of the fact that the new fuel adjustment clause proposed by the Company was coupled with and based on the proposed rate increases, that the schedule of proposed rate increases and the new fuel adjustment clause were inseparable parts of a package deal, and were mutually dependent each on the other. The new fuel adjustment clause was designed to pass on to the Company’s customers the savings effected by purchasing some of its electrical requirements from its sister companies rather than generating-all of its electrical needs with more expensive energy fuel. The new fuel adjustment clause contained a roll-in of 4.5 mills per KWH into the base rate, so fuel adjustment costs to the customer would be adjusted upward or downward from a 7 mill per KWH energy fuel cost contained in the new base rate (2.5 mills per KWH in old base rate plus 4.5 mill roll-in). The 4.5 mill roll-in into the base rate, the savings to be effected by purchasing approximately 30% of its electrical requirements, and the need for increased operating revenue were all factors carefully considered by the Company in arriving at and setting up the new schedule of proposed electric rates.
Many of the salient facts were agreed to by the Company and the Commission. Both agreed that the test year would end January 31,1975; both agreed that the rate base (the value of the Company’s property used and useful in generating electricity) should be $329,533,000.
In its order of July 12,1974, the Commission, in approving the capital structure of the Company, said:
“Extensive evidence was presented in this case on the capital structure of the Company and its effect on the total cost of capital. The appropriateness of the Company’s capital structure was not seriously challenged in this case and in keeping with the decision of our Supreme court in Mississippi Power Company vs. Mississippi Public Service Commission, 291 So.2d 541 (1974), we find that the capital structure of the Company of approximately 58.5% debt, approximately 10% preferred stock, and approximately 31.5% equity to be both appropriate and reasonable.
“The Company’s witness suggested the Company should be afforded the opportunity to earn between 14.00% and 14.50% on common equity capital and determined that the composite cost of capital for the Company was over 8.70% at December 31, 1973. The staff witness used a cost of equity capital of between 11.6% and 12.6%, and determined that the composite cost of capital should range from 8.38% to 8.68%.”
*772 The Commission’s staff witness, Loconto, did not use the capital structure approved by the Commission in arriving at his cost of equity capital of between 11.6% and 12.6%; the Company’s expert witness, Reis, used the capital structure approved by the Commission in arriving at his cost of equity capital of between 14.00% and 14.50%. The end result is that the Company’s figures are supported by substantial evidence and Commission witness Loconto’s figures are not.
In Mississippi Power Company v. Mississippi Public Service Commission, 291 So.2d 541 (Miss.1974), this Court vacated the Order of the Commission and approved the rate schedule filed by Mississippi Power Company, thus allowing Mississippi Power Company to earn a rate of return on common equity of 14.21%.
The Company’s bond interest coverage, although required to be at least twice the bond interest requirements, declined from 4.2 in 1972 to approximately 2.47 in May of 1974, and the Company’s preferred dividend coverage, although required to be at least 1.5 times interest and preferred dividend requirements, dropped from 2.43 in 1972 to 1.97 in 1973, and was estimated to drop to approximately 1.66 by May of 1974. These coverages have thus dropped to a critical level and without rate relief can only be expected to drop even further thereby seriously affecting Company’s ability to sell its securities in the open market.
The Company’s construction program for the immediate future (1974-1976) totals over $118,000,000 which, together with refunding of $12,000,000 of 3V8 first mortgage bonds due on September 1, 1974, will require the raising of substantial amounts of new capital. The evidence shows that current interest rates and dividends on preferred stock are approximately 10%, and that the embedded cost of debt capital to Company continues to rise.
All of these problems seem to have been recognized by the Commission because it said in its order of July 12, 1974:
“The Company’s witness on cost of capital and fair rate of return presented evidence on current interest rates on bonds and dividend yields on preferred stock which are the major sources of long term capital for public utilities. This evidence shows the current interest rates and dividends on preferred stock at 10%. Necessarily, the embedded cost of debt capital to the Company is rising.
“Further evidence presented in this case shows that investor confidence in common stock generally and utility common stocks, in particular, has decreased in recent years. The common stock of Middle South Utilities, Inc. is currently selling at below book value. The cost of common equity capital must be considered by the Commission in determining the cost of capital to the Company, and ultimately the rate of return for the Company. In view of current market conditions, the comparatively low common stock equity of the Company and the significance of this factor in arriving at overall cost of capital, the Commission regards common equity capital as an important element in allowing the rates as provided herein.

“This Commission cannot ignore considerable evidence presented in this case concerning current adverse circumstances peculiar to the electric utility industry. In addition to the effects of inflation on the cost of doing business previously mentioned, electric utilities face other problems. The Company is required to spend approximately $45 million dollars to modify existing plants to burn oil on a continuous basis. Of this amount, approximately $27 million is required for pollution control equipment. These and other factors mean the Company is paying approximately 70% more for capacity than in 1971. The Company’s investment in plant per customer was approximately $1,000 in 1964 and is approximately $2,000 in 1974.
“The Company can expect to experience the appeal of the United States government to the public to conserve all *773 forms of energy. Accordingly it anticipates a material drop in KWH sales below projected trends, and such a decrease in utilization means that expenses will not be spread over as many KW hours. Yet, even though conservation will save fuel, it is anticipated that the Company’s peak loads during hot weather will continue to grow along past trends. The Company will need the capacity to continue to meet growth in its service area, but will not have the high sales usually attendant with area growth. This development could depress future earnings.
“These and other factors require this Commission to give very serious consideration to rate adjustments sought by electric utilities. The ratepayer must be protected from unreasonably high rates and charges, while at the same time the rates established by this Commission must be considered in light of the ability of the utility to meet the future needs of its service area.”

“The essential problem of determining a reasonable rate of return for any public utility involves the practical consideration of whether it will be able to go into the capital market and compete with others for necessary capital. As suggested by Professor Welch in his work, Public Utility Regulation, Public Utility Reports, Inc., 1961, others in this context means utilities, non-utilities, governments, agencies, and all who compete for money in the money market. Capital funds usually go to the highest bidder. Those with money to invest are going to get the best price they can. The Commission, therefore, must take into account the sound business reality that utilities subject to its jurisdiction should be permitted to go into the money market on a favorable competitive basis.”
The Commission then stated its conclusion:
“The Commission has considered all relevant evidence of record in this case and has considered and given weight to the judgments and opinions of record, including those which agree with and those which differ from its own.
“After considering and carefully weighing all evidence presented in this case by all parties, we find that the Company, utilizing rates in effect prior to February 17, 1974, will be afforded the opportunity to earn a rate of return of not less than 8.17%. .
“ . . .We are convinced, however, that with continued prudent and economical management, the rates in effect prior to February 17, 1974 will yield to the Company a fair rate of return upon the reasonable value of the utility property used and useful in rendering service to its utility customers. The Commission is convinced that these revenues will be sufficient for the payment of operating expenses, the capital cost of the business, and reasonable dividends on its common stock.

“IT IS, THEREFORE, ORDERED that
1. The schedule of rates and charges herein filed by the Company on January 17, 1974, are found to be unjust, unreasonable and otherwise in violation of law and except as provided in Paragraph 2, the same are hereby cancelled.
2. That the new proposed fuel adjustment formula may be made effective except insofar as it would roll into the base rate 4.5 mills per KWH.”
It is hard to reconcile the conclusion of the Commission that the Company was entitled to no increase in rates. Especially is this true when, in the first portion of its Order, of July 12, 1974, the Commission went to great pains to list in detail the ever-increasing problems of public utilities. The Commission listed energy fuel problems, problems caused by inflation, greatly increased expenses to meet environmental pollution problems, and the' loss of investor confidence “in common stock generally and utility common stocks, in particular.”
*774 The Commission even made this observation in its Order:
“The Commission, therefore, must take into account the sound business reality that utilities subject to its jurisdiction should be permitted to go into the money market on a favorable competitive basis.”
Mississippi Code Annotated section 77-3-39 (1972) requires of the Commission:
“If, after such hearing, the commission shall find any such rate or rates to be unjust, unreasonable or unreasonably discriminatory, or in anywise in violation of the law, the same shall be set aside and the commission shall determine and fix by order such rate or rates as will yield a fair rate of return to the public utility for furnishing service to the public and shall make and file its conclusions and findings of fact supporting such order.” (Emphasis added).
The Commission made no findings of fact supporting its order, nor did it give any reasons for its conclusion, as specifically-required in Sec. 77-3-39. Indeed, after listing all of the problems confronting utilities, the conclusion of the Commission would seem to be a “non sequitur.”
In Mississippi Power Company v. Mississippi Public Service Commission, 291 So.2d 541 (Miss.1974), we said:
“Since the only major conflict in evidence was the difference of opinion of the two rate experts, and since the commission did not follow either rate expert and did not make a finding of fact to support its ultimate conclusion, we hold that the order of the commission was not supported by substantial evidence and was against the manifest weight of the undisputed evidence.” 291 So.2d at 558. (Emphasis added).
In Mississippi Public Service Commission v. Mississippi Valley Gas Company, 327 So.2d 296 (Miss.1976), this Court said:
“We find in this case as in Mississippi Power Co. v. Public Service Commission, supra, that except for the difference of opinion of the rate experts, the facts of this case are not in dispute. The commission did not accept the recommendation of either rate expert, and in fact fixed a rate of return lower than that recommended by its own expert witness, without sufficient finding of fact to support its ultimate conclusion.” 327 So.2d at 297-98. (Emphasis added).
We agree with the chancellor, who found:
“That the Commission’s Order of July 12, 1974, insofar as it cancels, modifies, disallows and disapproves the schedules of rates and charges, including the new fuel adjustment clause, as filed by Mississippi Power & Light Company on January 17, 1974, is contrary to the manifest weight of the evidence in this cause and is not supported by substantial evidence.
“That the schedules of rates and charges, including the new fuel adjustment clause, filed by Mississippi Power & Light Company on January 17, 1974, to be effective February 17, 1974, are reasonable, will provide the Company with a fair return and should be approved.”
The appellant contends that, even if this Court affirms the decree of the chancery court, the cause should be remanded to the Commission for the fixing of rates. Mississippi Code Annotated section 77-3-67 (1972) provides in part:
“(4) The court may hear and dispose of the appeal in term time or vacation and the court may sustain or dismiss the appeal, modify or vacate the order complained of in whole or in part, as the case may be. In case the order is wholly or partly vacated the court may also, in its discretion, remand the matter to the commission for such further proceedings, not inconsistent with the court’s order as, in the opinion of the court, justice may require.” (Emphasis added).
The statute clearly provides that it is discretionary with the chancery court whether it remands the matter to the Commission or not.
In the case at bar the chancellor did remand the matter to the Commission and *775 we agree that this was proper and within his discretion.
The decree of the chancery court is, therefore, affirmed and this cause is remanded to the Commission for the fixing of rates and further action not inconsistent with this opinion.
AFFIRMED AND REMANDED TO THE COMMISSION.
PATTERSON and INZER, P. JJ., and SMITH, SUGG, WALKER, BROOM and LEE, JJ., concur.
GILLESPIE, C. J., took no part.