MISSISSIPPI PUBLIC SERVICE COMMISSION *v.*
HOME TELEPHONE CO., INC.

No. 40999 April 13, 1959 110 So. 2d 618

*Wade Creekmore,* Asst. Atty. Gen., Jackson, for appellant.

*Morse & Morse,* Jackson, for appellee.

ETHRIDGE, J.

This appeal involves the validity of certain portions of the Public Service Commission fixing the rates for a small, independent telephone company. The commismission's order increased rates to be charged those served by the company; fixed a rate base, or a reasonable value of the property of the utility used or useful in furnishing service; made certain adjustments and reductions in operating expenses of the utility; and fixed the rate of return. The company appealed to the Chancery Court of the First Judicial District of Hinds County. Miss. Code 1942, Rec., Sec. 7716-26. That court held the rate base, as fixed by the commission, was supported by substantial evidence. But it reversed the order on three adjustments or reductions made by that agency in the company's operating expenses, and increased the rate of return on the rate base. The commission has appealed from that chancery decree. The company has taken no cross-appeal, so the commission's determination of the utility's rate base is not an issue in this case.

We are here concerned with the three adjustments or reductions made by the commission in the company's

operating expenses. They are (1) the reduction for rate making purposes of salaries paid to the president and treasurer of the company, which the commission found were excessive. (2) Disallowance of petitioner's proposal to amortize over a ten-year period past losses of $25,454.95 incurred by the company under the old rates, between the dates of the filing of its first petition for an increase in rates on May 23, 1955, and June 30, 1956, when the company put into effect under a refunding bond the new rates. (3) Disallowance of the company's loss on its abandoned, old telephone plant, $25,212.08, proposed to be amortized from operating expenses over a five-year period.

## I.

In 1953 and early 1954 the company obtained a loan of $463,000 from the Rural Electric Administration (REA), and with that sum rebuilt its entire system and converted from common battery to dial telephones. Operations under the new system were begun in March 1954. The equipment was new at the time of installation and of nationally recognized quality. The Public Service Commission granted the company an increase in rates which became effective in April 1954. The amount of that increase is not reflected in the record, but apparently it was granted because of the extensive improvements and conversion to the dial system.

In March 1955 the company again petitioned the Public Service Commission for a rate increase. After that hearing the commission's order found that the company had suffered an operating loss for 1954 of $15,151.98, and an actual loss of $4,796.66 for the first quarter of 1955, which indicated an anticipated loss of $19,552.54 for the entire year of 1955. But it declined to approve a rate increase. The company appealed under the statute in effect prior to the 1956 Public Utility Act. The circuit court in October 1955 reversed the commission's order,

and remanded the matter to the commission for a study to determine what would be a fair and reasonable increase in rates. On remand, that agency in January 1956 allowed a ten percent increase in rates. On appeal, the circuit court, on July 23, 1956, held this rate increase was inadequate and a denial of due process of law to the company; hence it again reversed the commission and remanded the petition for fixing of rates which would be fair and adequate to the company.

Effective March 29, 1956, the Legislature enacted the Public Utility Act of 1956. Miss. Laws 1956, Ch. 372; Miss. Code 1942, Rec., Secs. 7716-01 to 7716-38. On July 26, 1956, the Home Telephone Company again petitioned the commission for an increase in rates, and attached to it a proposed schedule of rates. The petition stated an intent to put the rates into effect on September 1, 1956, under a refunding bond. Code Sec. 7716-10. On October 15 the commission suspended the increase in rates for 90 days pending a full investigation and later suspended them for six months. However, on petition the commission approved the company's putting the increased rates into effect, upon its making a refunding bond of $20,000, conditioned upon the refund of any excessive rates, if they were finally determined to be excessive.

A hearing was had on the petition in November 1956. Home Telephone Company offered two witnesses, Lawrence Curbo, a certified public accountant, and Lon J. Darley, president and the manager of appellee. The commission's two witnesses were Douglas H. Brumfield, its chief accountant, and Kenneth Croy, its chief engineer. Complaints were made about the service of the company but the commission found in its order that "its decision in this case is not based in anywise upon the alleged inadequacy of such service." It passed only upon the propriety of rate increases.

Home Telephone Company operates in Byhalia and Olive Branch, and nearby rural areas, in a territory of 750 square miles. It serves 1,113 customers. Lon J. Darley acquired the property sometime around 1939. It then had 35 telephones at Byhalia and 39 at Olive Branch, operated by magnetos. He began to improve it, and in 1948 converted both exchanges to common battery equipment with switchboards and operators. Over this period he gradually improved the properties. In 1953-1954 the company borrowed from the REA $463,000, at a rate of interest of 2 per cent per annum, payable over 35 years and with this loan installed a modern dial telephone system. Residential telephones produce 87.96 per cent and business telephones 12.04 per cent of the revenue. The total amount of capital stock issued is $13,-980. This consists of $10,000 par value common stock, and $3,980 of 5 per cent preferred stock. Total investment consists of an equity capital of approximately 7 per cent, and debt of 93 per cent.

The rate base of the company was determined by the commission to be $439,841.17. As defined by Sec. 8 (a) of the Act, it found this was the reasonable value of the property used or useful in furnishing service. The company contended for slightly more, but took no cross-appeal from the chancery court's decree approving the commission's rate base.

The order of the commission allowed increased rates which would provide for annual additional revenues of $8,804.40, and a net operating income of $9,634.78 per annum. Dividing this figure by the rate base of $439,841.17, the result is a rate of return of 2.19 per cent. It was said the reason the rate of return appears to be low is the extremely low cost of capital to the company, and the fact of its operating on approximately 97 per cent of borrowed money and 3 per cent of capital stock. The commission's order stated: ''The Commission has allowed earnings of 5% on the 5% preferred stock and

about 10% for dividends on the common stock and for surplus. The seemingly high percentage of 10% is allowed because the risks of operating a small independent utility are much greater than for a large utility which may have available ready sources of capital. The allowance for cost of equity capital must be determined for each company upon the peculiar facts and circumstances affecting such utility. So the allowance of approximately 10% for dividends on common stock and providing for surplus in this case shall not be taken or considered as a precedent in any other case before this Commission. Obviously, if the ratio of equity capital to debt capital in any particular case were greater, the rate of return would be increased correspondingly.

"It is manifest that with an established rate base, as here, the rate of return is a function of the net operating income."

The company contended that it needed and was entitled to a return of 2.666 per cent on its recommended rate base. It sought this rate of return without any of the adjustments made by the commission.

Code Section 7716-26 defines the scope of judicial review of orders of the Public Service Commission under the Public Utility Act of 1956. Briefly, it is upon the entire record under the substantial evidence rule. The statute provides: "(c) No new or additional evidence shall be introduced in the chancery court but the case shall be determined upon the record and evidence transferred.

"(d) The court may hear and dispose of the appeal in term time or vacation and the court may sustain or dismiss the appeal, modify or vacate the order complained of in whole or in part, as the case may be; but in case the order is wholly or partly vacated the court may also, in its discretion, remand the matter to the commission for such further proceedings, not inconsistent with the court's order as, in the opinion of the court, justice may

require. The order shall not be vacated or set aside either in whole or in part, except for errors of law, unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights."

## II.

The commission cut the salary of the president from $9,000 to $7,500 per year, and that of the treasurer, Mrs. Darley, from $3,000 to $1,500 per year. It found that, especially since the company had been operating at a loss for several years, these salaries were excessive and should be reduced for rate making purposes. The chancery court reversed the commission in this respect, and held the evidence did not warrant a finding that salaries were excessive. It further observed there was no evidence of fraud, inefficiency or mismanagement. We agree with the chancery court.

██ ██ In determining the sufficiency of the rate of return, the sum required by the utility to meet its operating expenses must be considered. Included in operating expenses are salaries of officers, if reasonable. 43 Am. Jur., Public Utilities and Services, Sec. 141; 73 C. J. S., Public Utilities, Sec. 25 (2), 1042. ██ ██ A regulatory commission has the power to disallow excessive salaries for rate making purposes; that is, such disallowance would not prohibit the actual payment of excessive salaries, but the utility cannot charge such excess payments to operating expenses in a rate case. ██ ██ Where salaries are unreasonable in amount, commissions usually "permit the inclusion in operating expenses of only such sums as are fair and reasonable, considering the gross operating revenue, the total of operating expenses, and the amount and quality of the work performed by the officers of the utility." Barnes, The Economics of

Public Utility Regulation (1942), pp. 618-619; Anno. 52 LRA (NS) 53 (1914).

■■ There is no substantial evidence to support the commission's finding that the salaries paid to the president and treasurer are excessive and unreasonable. The evidence indicates the contrary. Darley is an experienced executive in the field of independent telephone companies. He and his wife live in Memphis, which is only a short distance from the company's offices in Byhalia. He devotes all of his time to the job, is the principal owner, and has the responsibility for managing the company. The corporation has assets of about $450,000, and of course must be managed by someone who knows the job. The testimony reflects the salary paid Darley for his management of this company is entirely reasonable, and should not have been reduced. The same observation applies to Mrs. Darley, who earns $3,000 a year as treasurer. In addition to her duties as treasurer, she has charge of the books and records, cash assets, does office work, and supervises the day by day accounting. She spends about one-third of her time in the company office, but maintains a desk and does considerable work at her home. There is no evidence indicating she does an incompetent or inadequate job. The commission was not warranted on this record and under modern conditions in concluding that this necessary operating expense could be met by a monthly salary of $125.

■■ Where officers' salaries are fixed by themselves as stockholders and members of the board of directors, the commission should carefully scrutinize the compensation paid them. The fact that the company has been losing money in recent years would also be relevant, although at least some of appellee's losses are attributable to delay by the commission in properly raising the utility's rates. However, these two factors are not controlling here, because there is no substantial evidence to warrant a finding that the salaries are excessive. In

brief, we affirm the chancery court insofar as it set aside the commission's reduction of officers' salaries.

### III.

The company sought to recover, out of its operating expenses, past losses of $25,454.95, incurred by it between the filing of its first petition for an increase in rates in May 1955, and the date it put into effect increased rates under a refunding bond, June 30, 1956. It proposed to amortize this amount over a ten-year period, by including an annual operating expense of $2,545.50. The commission disallowed this entire item. The chancery court reversed the commission, but reduced the amount of past losses chargeable to operating income, to $14,000, to be amortized over a ten-year period. The company did not cross appeal from that decree. The trial court reasoned the commission and courts should have a reasonable time to consider applications for rate increase, and six months was an adequate period following the filing of appellee's first application for rate increase, so it allowed past losses subsequent to that six-month period, and up to June 30, 1956. In this respect the trial court was in error.

43 Am. Jur., Public Utilities and Services, Sec. 163 summarizes the general rule: "A public utility is not entitled to a return large enough to enable it to recoup past losses, and such losses cannot be used to enhance the value of property or to support a claim that rates for the future are confiscatory." It is generally held that neither losses sustained nor profits gained by a public utility in the past may be taken into account in fixing rates to be charged in the future. 73 C. J. S., Public Utilities, Sec. 25 (d), pages 1045-1046. A small minority of older cases have made a distinction, or exception, to this rule, as to losses incurred while a utility was operating under rates prescribed by public authority.

Ibid. But the usually accepted doctrine today does not recognize that exception.

Nichols, Ruling Principles of Utility Regulation: Rate of Return (1955), pages 420-425, states the accepted rule and the reasons for it: "A public utility company may not insist, as a matter of constitutional right, that past losses be made up by rates to be applied in the present and future. Compelling a utility company to operate at a loss amounts to confiscation, as has been pointed out, but whether after the confiscation of income has taken place, the constitutional inhibition goes so far as to guarantee the company the right to make up such losses at the expense of present ratepayers, is a different question. Years ago, it was said that a present return that is nonconfiscatory cannot be held confiscatory on the theory that it is insufficient to enable the company, in addition, to recoup early losses."

The leading case dealing with this issue is Galveston Electric Co. v. City of Galveston, 258 U. S. 388, 394-395, 42 S. Ct. 351, 66 L. Ed. 678, (1921). See also Georgia Railway & Power Co. v. Railroad Commission, 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144 (1923). A recent decision reaching the same result and considering its history and rationale is N. J. Power & Light Co. v. State Department of Public Utilities, 15 N. J. 82, 104 A. 2d 1 (1954).

■■ ■ Whether a rate established by a regulatory commission will yield more or less than a fair return during its continuance is a risk of the business, in the absence of a judicial determination of its unreasonableness. The lag which accompanies the making of rate changes is a major problem in utility regulation. The commission may not amortize a loss or make a rate sufficiently low to recapture any excess. So the rule cuts both ways. Rate making is necessarily present and prospective. The rule urged by appellee would require the commission to look both forward and backward. This

posture would be wholly inconsistent with the business-like processes of rate making that have received the approval of the courts. In brief, the commission was correct in denying the company a right to amortize out of future rates past losses. ▆▆ We reverse the decree of the chancery court to the extent that it allowed such past losses.

## IV.

The company installed in 1948 a common battery telephone system, with a switchboard and operators. It abandoned that plant in early 1954 when it installed a modern dial telephone system, with the proceeds of the $463,000 loan from REA. The undepreciated value of the whole plant which was abandoned was determined to be $25,-212.08. The company's requested rate schedule sought to amortize out of operating expenses this loss on the abandoned telephone plant, over a period of five years. This would result in a charge to operating expenses for five years of approximately $5,000 per year, and, of course, would require increased rates to cover it. The commission disallowed this item.

Curbo, appellee's accountant, testified this was in accord with the REA accounting system. Curbo had not made any study as to whether adequate depreciation had accrued on the old plant prior to the cutover to the new plant. The loss on abandoned telephone plant was not included in the rate base as reserve for depreciation. Following the accounting system of the Federal Communications Commission (FCC), appellee charged the loss to its deferred charge classification, telephone plant adjustment. Appellee is not subject to regulation by the FCC, but its loan contract with the REA provided it would follow FCC accounting procedures.

Douglas Brumfield, chief accountant for the commission, testified Curbo's audit of the company was proper, but the commission removed the amortization of the

old plant from operating expenses, because it did not think future customers should have to pay that charge. The record does not indicate that appellee had inadequate past depreciation on the old plant. The new plant simply replaced the old one before its estimated life had expired. Brumfield recognized that in other instances elsewhere abandoned plants were amortized out of operating expenses. The chancery court reversed the commission on this issue, and held that its order, disallowing amortization of loss on the abandoned plant out of operating expenses, was not supported by substantial evidence, and it should be allowed over a five-year period.

 A public utility is entitled to an allowance for consumption of capital; that is, it is entitled to earn or have included in its return a reasonable sum for depreciation. However, it is not ''entitled to an allowance for extra-ordinary obsolescence, so called, or extensive supersessions of property or equipment.'' 73 C. J. S., Public Utilities, Sec. 25 (b); see 43 Am. Jur., Public Utilities and Services, Sec. 145. The theory is that future users of services should not be charged with losses which the company will incur by changing its type of service.

There is disagreement among accountants as to whether a loss resulting from the premature retirement of property due to extraordinary obsolescence should be charged immediately to surplus or kept on the books and amortized against future income. Most accountants appear to favor an immediate charge of a retirement loss to earned surplus. These conflicts in accounting theory emphasize a need for a regulatory commission to have a reasonable area of discretion in prescribing accounting systems for public utilities.

The main issue is not merely the accounting treatment of retirement losses. In this and other utility cases, the issue is the proper distribution of the loss between the consumer and the investor. Charging the loss to surplus will place the cost of extraordinary obsolescence

on the investors, while amortizing the loss as a future operating expense will place the burden on future consumers. Note, 65 Harv. L. Rev. 1431, 1438 (1952).

The three outstanding examples of extraordinary utility obsolescence in this century have been the replacement of street cars by buses, which generally were charged to the investor, to surplus; the replacement of manufactured gas by natural gas, which generally was charged to the consumer, to future operating expenses; and the replacement of common battery telephone systems with dial systems. 65 Harv. L. Rev. 1439. It appears that amortization of losses on telephone property abandoned because of dial conversion have generally been disallowed as a charge against future operating expenses. Regulatory commissions elsewhere have usually required this to be charged to surplus. See Bruce Telephone Company, 14 PUR 3d 188 (Wis. PSC, 1956); In re Turtle Lake Telephone Company, Inc., 22 PUR 3d 458 (Wis. PSC 1958); see also Minneapolis Street Railway Company, 10 PUR 3d 356, 376 (Minn. RR. Comm. 1955); Re Laclede Gas Light Company, 7 PUR (NS) 277 (Mo. PSC 1934). In general, the charge to future operating expenses has been allowed only where the consumer receives benefits by offering him the same service at a lower rate, or better service at the same rate. Neither of these circumstances exist in the instant case, and the commission had a right to consider that.

 ██ Moreover, inability of accountants to agree among themselves on the proper treatment of extraordinary obsolescence, entirely aside from the important, partly legislative question as to whether the loss should be placed on investors or consumers, emphasizes the reason why the legislature in Code Sec. 7716-07 vested the commission with considerable authority to establish a system of accounts to be kept by public utilities; and with the power to require utilities to carry a "reasonable or adequate depreciation account" in accordance with

the commission's rules. Moreover, the commission could consider that "some obsolescence cost usually is anticipated in the general depreciation account." Troxel, Economics of Public Utilities (1947) pp. 365, 367-368. ■■ The commission has disallowed this extraordinary obsolescence charge to operating expenses. We are unable to say that there is not substantial evidence to support that decision, which involves legislative as well as quasi-judicial findings. The weight of authority in related cases supports the commission's ruling in this respect.

■■ Section 7 of the Public Utilities Act provides that, if a utility "regulated by" the FCC complies with the FCC's system of accounts, the commission "may" deem it a sufficient compliance with its requirements, but the commission may prescribe supplemental or modified methods. This provision gives the commission power, at least under some circumstances, to supplement or modify the FCC's requirements for utilities also regulated by that body. ■■ However, appellee is not regulated by the FCC, so any limitation in Sec. 7 on the commission's accounting powers does not apply in this case.

Since the commission's disallowance of the proposed charge for retirement losses against future operating expenses is supported by substantial evidence, we affirm that part of its order, and reverse to that extent the decree of the chancery court.

## V.

■■ The remaining consideration is with reference to the rate of return. A public utility is entitled to receive "fair, just, and reasonable rates" which will "yield a fair rate of return . . . upon the reasonable value of the property of the utility used or useful in furnishing service." Code Secs. 7716-08, 7716-11. ■■ The commission's order, with the adjustments as to salaries, past losses and plant replacement loss, allowed appellee

a rate of return of 2.19 per cent on its rate base. Appellee asked for a rate of return of 2.66 per cent on its requested rate base and with these charges to operating expenses. The chancery court reversed the commission on these three adjustments, and fixed a rate of return of 2.51 per cent on the rate base as determined by the commission.

 The chancery court erred in fixing a rate of return. The function of rate making is purely legislative in character. It is not within the power of a court to fix the rates to be charged by public utilities, although a court may restrain the imposition of confiscatory rates, or, under the Public Utility Act, determine whether the rates as fixed are supported by substantial evidence or within the other statutory restrictions set forth in Code Sec. 7716-26. 43 Am. Jur., Public Utilities and Services, Sec. 83, pages 185-191. So that part of the decree fixing a rate of return for appellee is reversed.

In summary, the chancery court's decree is reversed in all respects, except that it is affirmed insofar as it overruled the commission's reduction of salaries. The cause is remanded to the commission for further proceedings in accordance with this opinion, and for the determination and fixing of a fair, just, and reasonable rate of return. Since we are setting aside part of the commission's order, we do not now pass upon whether the rate of return allowed by the commission meets the statutory and constitutional standards.

 The refunding bond, made by appellee in accordance with Code Sec. 7716-10, to cover excessiveness, if any, in the rates now in effect, shall continue in effect pending a final determination of rates and their validity. Code Secs. 7716-27, 7716-28; Ala. Public Service Comm. v. So. Bell Tel. & Tel. Co., 106 So. 2d 163, 170-171 (Ala. 1958); Ala. Public Service Comm. v. So. Bell Tel. & Tel. Co., 42 So. 2d 655, 690-691 (Ala. 1949).

Affirmed in part, reversed in part, and cause remanded to Public Service Commission.

All justices concur.