CONNECTICUT LIGHT AND POWER COMPANY *v.*
DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.

SUPERIOR COURT     JUDICIAL DISTRICT OF     FILE No. 0315373
HARTFORD-NEW BRITAIN AT HARTFORD

Memorandum filed May 30, 1986

*Day, Berry & Howard,* for the plaintiff.

*Robert Golden,* assistant attorney general, for the named defendant.

*Richard Webb,* assistant attorney general, for the defendant office of policy and management.

*James F. Meehan,* consumer counsel, for the defendant division of consumer counsel.

SATTER, J. This is an appeal by the Connecticut Light and Power Company (CL&P) from interim orders issued by the department of public utility control (DPUC) on April 4, 1985 (the April 4 order), and September 4, 1985 (the September 4 order), and from the DPUC's denial on February 19, 1986, of CL&P's petition for rescission of those orders.

## I

### BACKGROUND AND FACTS

CL&P is a public service company organized and existing under the laws of Connecticut which provides electric and gas service to customers in Connecticut.

CL&P's current rates for gas and electric service were approved by the DPUC in a decision issued in December, 1983, in DPUC Docket No. 83-07-15. In determining the revenue that the approved rates were designed to produce, the DPUC adopted a rate of return on CL&P investments (rate base) determined to be adequate to pay all capital costs, including interest, dividends and a return on common stockholders' equity (ROE), that would be reasonable and sufficient to allow the company to attract needed capital. The ROE approved by the DPUC in DPUC Docket No. 83-07-15 was 15.9 percent.

After the December, 1983 rate order went into effect, and throughout 1984, the company's ROE was never less than 17.37 percent and for the twelve months ending December 31, 1984, it was 20.68 percent.

On November 16, 1984, the division of consumer counsel (DCC), petitioned the DPUC to open, reconsider and partially reverse the December, 1983 rate order on the grounds that the then current and projected earnings of CL&P were excessive and were likely to remain excessive for the foreseeable future. On December 8, 1984, the DPUC determined that a

new proceeding (DPUC Docket No. 84-12-11) would be instituted for the purpose of determining whether the rates of the company should be adjusted in light of current and or projected earning levels. The investigation was undertaken pursuant to §§ 16-9, 16-11, 16-19 and 16-19e of the General Statutes.

Pursuant to a notice of hearing dated January 8, 1985, a public hearing on the matter was convened on March 5, 1985. The hearing continued on March 6, 11, 12, 13, 25 and 26, 1985. The DPUC proposed an interim order on March 11, 1985, and a public hearing on the proposed interim order was held on March 12 and 13, 1985. The DPUC proposed a further interim order which was distributed on March 22, 1985, and a public hearing on the further proposed interim order was held on March 25 and 26, 1985. All parties were given the opportunity to file briefs and written comments on each proposed interim order.

Among those granted party status were the attorney general and the DCC, which have appeared in this appeal.

The hearing focused on the sharp rise in the deferred fuel account. To understand this account requires some background on CL&P's sources of energy for generating electricity and how it recovers these energy expenses. CL&P has three sources of energy: hydroelectric power, nuclear power and fossil fuel. Hydroelectric power costs a fraction of a cent per kilowatt hour, nuclear power one cent per kilowatt hour and fossil fuel four cents per kilowatt hour.

The base rate per kilowatt hour is a mix of these three costs and it was set in the 1983 rate proceeding at two cents per kilowatt hour. Pursuant to General Statutes § 16-19b (a), the fossil fuel adjustment clause (FFAC), the DPUC authorized CL&P to superimpose upon existing rate schedules, payable by its customers, an amount

which reflected changes in the price of fossil fuel required for the generation of electricity, and also, pursuant to § 16-19b (g), the generation utilization adjustment clause (GUAC), an amount which reflected changes in electric costs resulting from changes in the level of operation of the several components of its generation system.

Since the base rate assumes almost full use of cheap hydroelectric and nuclear power, when sales volumes exceed the sales volumes of the test year, the additional energy has to come from the more expensive fossil fuel. In 1981, the DPUC ruled that for sales up to the test year volume CL&P was required to charge to current operating expenses fuel costs recovered from base rates and FFAC and GUAC. For sales in excess of test year volume, however, the 1981 order allowed the company to defer, for future recovery in another rate year, fuel costs above the revenue recovered from base rates and from FFAC and GUAC. Under that ruling $3 million in deferred fuel costs accumulated and were allowed in the 1983 rate decision to be amortized over the year 1984.

In its March, 1985 hearings the DPUC observed that the financial indicators for CL&P were much better than had been forecasted when the rates were set in 1983, due to a stronger economy, lower inflation and more favorable financing conditions. The primary reason for the company's high earnings, however, was sales growth at a rate exceeding cost increases. This sales growth had two effects on the company's financial situation: first, it increased CL&P's ROE, as of the twelve months ending February, 1985, to 19.8 percent; second, simultaneously, it increased the deferred fuel balance to $84 million. CL&P itself estimated that the balance in that account as of April 30, 1986, when it was expected new rates would go into effect, would be $129 million.

The DPUC also anticipated that when CL&P filed its expected rate application for 1986, it would request that some portion of its Millstone III investment (amounting to $2.48 billion) be brought into the rate base. Thus, the extraordinarily high deferred fuel account, which had to be amortized in future years, together with the Millstone III situation, clearly indicated a serious 1986 rate problem.

The DPUC stated in its April 4 order: "We find that the extremely large and growing balance in the deferred fuel account poses a critical problem in our efforts to protect ratepayers from unwarranted accumulations of past period expenses, continued error in a company's financial projections or excessive rates of return. The orders set forth in this interim decision are designed to address these deficiencies."

The DPUC made the following findings of fact:

"(1) For the twelve month period ending February 28, 1985, CL&P's ROE on an average equity basis averaged 20.30 percent (cost of capital method). This is significantly above the company's ROE of 15.9 percent allowed in Docket No. 83-07-15.

"(2) The company's average ROE, according to its own calculations, over the twenty-eight months ending April, 1986 (the maximum anticipated time the present rates are estimated to be in effect), will be 18.1 percent . . . .

"(3) The company's deferred fuel account, typically amortized in rates as a result of a rate hearing, has grown significantly since the last rate case, primarily due to higher sales than those reflected in Docket No. 83-07-15.

"(4) The balance in the deferred fuel account as of April 30, 1986, without any adjustment, is estimated at $129 million. . . ."

The DPUC entered the following two orders:

"(1) The authority hereby orders that, effective March 1, 1985, the company shall commence expensing monthly, in subaccount 501.05, an amount equal to the difference between its actual monthly fossil fuel expense and the monthly fossil fuel revenues obtained from base rates, the FFAC and the net of GUAC deferrals. . . .

"(2) The company is further directed, commencing March 1, 1985, to remove and divert current construction work in progress (CWIP) revenues to reduce the deferred fuel balance, subaccount 186.13, on a going forward basis."

CL&P did not protest the elimination of the CWIP revenue and its use of $19 million to reduce the deferred fuel account balance.

It should be emphasized that the April 4 order protected the fossil fuel costs which had been properly deferred through February 28, 1985, for recovery in future years.

On August 6, 1985, the DPUC issued a supplemental interim order which applied the credit balance which had accumulated under the GUAC (amounting to about $19 million) to reduce the deferred fuel balance even further. CL&P did not oppose, and in fact actually supported, this adjustment.

In August, 1985, the DPUC continued its hearing on DPUC Docket No. 84-12-11.

In the September 4 order the DPUC made the following findings of fact:

"(1) The company's twelve month average return on common equity, based on the cost of capital method, has been excessive, far above the 15.9 percent found just and reasonable in the company's last rate proceed-

ings, as demonstrated by the most recent return for the twelve months ending June 30, 1985, of 19.43 percent.

"(2) The company's average return on common equity should not be allowed to continue to exceed unduly the level of 15.9 percent found just and reasonable in the company's last rate proceeding. The most direct way of addressing the contingency is to limit the company's earnings on a prospective basis."

The September 4 order then provided in part:

"(2) Beginning with the month of August, 1985, in any month where CL&P's monthly annualized ROE, computed on a cost of capital basis, exceeds 15.9 percent, the company shall place a commensurate amount of funds in a reserve account for use as an offset to its next general rate request."

On November 24, 1985, CL&P requested approval of the DPUC to amend its existing rates to increase annual revenues by $155,497,000, or 9 percent over the test year revenues. Included in the application was a request to amortize $45 million in the deferred fuel account accumulated prior to the effective date of the April 4 order.[1] That rate case has been given DPUC Docket No. 85-10-11 and is the current rate application.

On December 24, 1985, CL&P petitioned the DPUC to rescind the orders of April 4 and September 4 on the ground that its ROE for each twelve month period ending the months of January through April was anticipated to be below the 15.9 percent approved by the DPUC in the 1983 order. No hearing was requested by CL&P or held by the DPUC. The DPUC denied CL&P's petition on February 19, 1986.

---

[1] The $84 million in that account, as of February 28, 1985, was reduced by application of $19 million of CWIP revenues and approximately $19 million of GUAC funds.

On April 1, 1986, in the pending rate application (DPUC Docket No. 85-10-11) the DPUC granted CL&P's request to defer costs associated with Millstone III from the date that that unit begins commercial operation to the effective date of CL&P's amended rate schedule.

Beginning in January, 1986, for the first time, CL&P was required by the September 4 order to place in the ratepayers' fund earnings in excess of "annualized monthly ROE" of 15.9 percent. By May, 1986, this ratepayers' fund had accumulated approximately $33.5 million.

From March 1, 1985, the effective date of the April 4 order, to May 31, 1986, CL&P has been required to expense fuel costs of $36 million. From January 1, 1986, the date as of which CL&P petitioned for rescission of the April 4 order, which petition was denied by the DPUC, through May 31, 1986, CL&P has been required to expense fuel costs of $8,555,000.

Over the period of the 1983 rate order, from January 1, 1984, through April, 1986, a period of twenty-eight months, CL&P's annual return on equity averaged 18 percent.

## II

### STANDARD OF REVIEW

Pursuant to § 16-35 of the General Statutes, appeals from orders of the DPUC are governed by § 4-183 of the uniform administrative procedure act. Subsection (g) of the latter section provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact," and the court may reverse or modify a decision if "the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the

agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.''

The standards imposed on the DPUC for establishing the level and structure of rates are expressed in § 16-19e (a) (4) as follows: ''that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable.''

When a DPUC order relating to rates is challenged in court, the question is whether the order, viewed in its entirety, meets the requirements of § 16-19e (a) (4). If the total effect of the order cannot be said to be unjust or unreasonable, it must be affirmed. ''And he who would upset the rate order . . . . carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.'' *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S. Ct. 281, 88 L. Ed. 333 (1944), quoted in *Woodbury Water Co.* v. *Public Utilities Commission,* 174 Conn. 258, 264, 386 A.2d 232 (1978).

## III

### THE APRIL 4, 1985 ORDER

The broad power granted to the DPUC to regulate public service companies under chapter 277 of the General Statutes § 16-1 et seq., and the responsibility imposed on it to balance company and consumer interests requires it to make ''pragmatic adjustments''; *Fed-*

*eral Power Commission* v. *Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S. Ct. 736, 86 L. Ed. 1037 (1942); in between rate cases, to meet sudden emergencies. In particular, the DPUC has deferred the imposition of an unexpected expense occurring in one period and allowed it to be amortized, over a period of time, in a succeeding rate period.

In *Connecticut Light & Power Co.* v. *Public Utility Control Authority,* 176 Conn. 191, 405 A.2d 638 (1978) *(CL&P* v. *PUCA),* the Supreme Court impliedly approved the agency's authorizing the company to amortize over several years the expenses of storm Felix, a Millstone outage and certain fuel expenses. The obvious consequences of such a practice is that company losses, resulting from unusual expenses incurred in one rate period, are imposed upon ratepayers in another rate period. Amortization of such expenses over several years makes practical sense, however, because it not only spares the company a sharp drop in its earnings in the year that the expenses occur, but it also spares customers a sudden and precipitous rise in rates in the following year. Id., 214.

The DPUC has not only imposed present costs on future customers, it has also imposed future costs on present customers. In *CL&P* v. *PUCA* the court approved the agency's allowing the company to accrue depreciation on Millstone I and II at a rate of 110 percent of the original cost in order to cover the expense of decommissioning these plants at the end of their useful life. The extra 10 percent represented an additional cost borne by present customers to pay for a future event.

CL&P here acknowledged the DPUC's right to make adjustments during the rate period by supporting the DPUC's order applying the reserve in GUAC to reduce the deferred fuel account.

The justification of amortizing an extraordinary expense to avoid rate shock, expressly approved by the Supreme Court in *CL&P* v. *PUCA,* is precisely the justification used by the DPUC in the April 4 order to terminate any further deferring of fuel costs and to require that they be expensed as current costs. The projection that the deferred fuel account would rise to $129 million by May, 1986, when coupled with some portion of the Millstone III investment being brought into the 1986 rate base, demanded that the DPUC take ameliorating action to protect future ratepayers.

It is important to observe that the rise in the deferred fuel account was the result of unexpectedly high sales. Prior to 1983, CL&P sales had been flat, and under the 1981 order the deferred fuel account had only accumulated $3 million in two years. In April, 1985, it was at $84 million and anticipated to rise at 5 percent every month.

An unexpected rise in sales volume, resulting in a high deferred fuel account, is no different than an unexpected storm, resulting in heavy immediate expenses. The DPUC is just as justified in ending the deferment of fuel costs in order to reduce future rate shock as it is to defer a sudden emergency expense in order to bolster CL&P's present earnings.

This is particularly so when the high deferred fuel account was a function of high sales which were also the cause of CL&P's earnings in excess of what the DPUC had established as a fair and reasonable ROE.

CL&P argues that the deferred fuel account mechanism was an integral part of the DPUC rates approved by the 1983 decision. In the DPUC decisions of December 8, 1983, and December 14, 1983, however, there is no mention of the deferred fuel account. The decision is silent on the matter. Thus, CL&P can point to no expressed grant of right in those decisions which

was taken away from them by the April 4 order. In that regard this case differs from *CL&P* v. *PUCA*, where the agency specifically permitted CL&P to amortize certain expenses over future years and the agency then sought to disallow those expenses before they had been fully amortized. The court struck down the agency's latter order.

It may be noted that the 1981 ruling allowing the deferred fuel account has no statutory authorization, in contrast to the FFAC which is authorized by § 16-19b (a) and the GUAC which is authorized by § 16-19b (g). Even assuming the 1981 ruling was applied as a general rate-making principle in the 1983 rate decision, CL&P acquired no vested right in it. There is no proof that CL&P relied upon the ruling in that 1983 proceeding and, as indicated above, the DPUC made no reference to it in its 1983 decision.

Moreover, a substantial change of circumstances justified the DPUC's rescinding of the ruling. The 1981 decision had resulted in a $3 million deferred fuel account. By March, 1985, that account had risen to $84 million and was projected to rise to $129 million by May, 1986. In such a situation, the DPUC had not only the power and the right, but even the duty to act to prevent such an impact on future ratepayers.

There is also no merit to CL&P's contention that the April 4 order created a new current fuel expense without providing offsetting revenue to cover that expense. The current fuel expense imposed on CL&P was the actual fuel expense it incurred from its sales. Moreover, associated with those higher costs were higher revenues from higher sales, resulting in higher earnings.

It is not even in CL&P's interest to contend that the DPUC acts illegally when, without a full scale rate proceeding, it makes adjustments to deal with unexpected situations. If the DPUC were to lack the power to order

the expensing of all current fuel costs in order to protect future ratepayers, it might also lack the power to order the deferral of unexpected current expenses in order to protect CL&P's present earnings.

This court concludes that the April 4 order is within the discretion of the DPUC and is not unjust, unreasonable, arbitrary or illegal.

In December, 1985, CL&P moved to rescind the April 4 order on the ground that its ROE for the twelve months ending January through April, 1986, would be below 15.9 percent.

By then CL&P had filed a new rate application seeking rate increases effective in May, 1986. The court finds it reasonable for the DPUC to decide to deal with CL&P's diminished ROE in the new application.

Moreover, despite the fact CL&P's annual ROE was anticipated to fall below 15.9 percent for each month from January to April, 1986, for the overall period of the 1983 rate order, from January, 1984, to April 30, 1986, CL&P's average ROE was 18 percent. That is an appropriate period to consider in determining that the 1983 rates were sufficient to cover CL&P's operating costs, as required by § 16-19e (a) (4).

The basis for the April 4 order was not only the high ROE CL&P was enjoying at the time of the order, but also the avoidance of rate shock to customers in future years if the deferred fuel account were allowed to rise uninterruptedly with increased sales. The latter reason alone justified the DPUC in continuing the April 4 order.

This court concludes that the DPUC's denial of CL&P's petition to rescind the April 4 order was not arbitrary, unreasonable, illegal or in abuse of its discretion.

## IV

### THE SEPTEMBER 4, 1985 ORDER

The September 4 order has three salient characteristics: (1) Contribution by CL&P to the ratepayer fund is triggered by CL&P's "monthly annualized ROE" exceeding 15.9 percent; (2) CL&P is allowed no reduction from the fund for the months that its monthly annualized ROE is less than 15.9 percent; (3) the fund is to be used as an offset to CL&P's next general rate request.

The first and the second characteristics of the September 4 order are arbitrary and the third is illegal.

The notion of a "monthly annualized ROE" is unique. It is not used by any other regulatory agency in the country, or even referred to by public utility commentators. Rather, whenever ROE is mentioned, it is meant to denote an annual return on equity.

Professor Francis X. Welch in his Cases and Text on Public Utility Regulations (Rev. Ed. 1968) pp. 477–78, defines rate of return as, "the computation of that amount deemed to be reasonable by the regulatory body of an *annual* profit to the owners of the utility in return for the use of their property. . . . Thus a 7% rate of return for a utility having an allowable rate base of $1 million would yield the owners an *annual* net return of $70,000." (Emphasis added.)

"[M]onthly annualized ROE" is calculated by ascertaining a utility's operating income for a *single* given month, dividing that figure by the utility's total average equity over twelve months and multiplying the result by twelve.

The DPUC's concept of "monthly annualized ROE" fails to take into account a fundamental fact: CL&P's operating income varies substantially from month to

month throughout the year, in large part as the result of changing sales resulting from varying weather conditions. At the same time, its operating expenses, other than fossil fuel expenses, are relatively constant. Generally, for months of relatively low sales, and, therefore, low revenues, returns on rate base are substantially below average. For months of relatively high sales and revenues, returns on rate base are greater than average. As a result, the "monthly annualized ROE" for January or August of a given year, for example, will be considerably higher, as a result of high heating and air-conditioning loads, than it will be during May or October of the given year. Thus, "monthly annualized ROE" is useless in determining a utility's annual earned ROE.

The best illustration of how the "monthly annualized ROE" grossly distorts earned returns, because of seasonal variations in sales, is that in exactly the month of January, 1986, when the company's "monthly annualized ROE" for the first time exceeded 15.9 percent, its ROE for the twelve months ending December 31 fell below 15.9 percent. This disparity between the two methods of calculating ROE continued from January to April, 1986.

When an accounting method is an express deviation from past practice and so unreasonable as to be without rational basis, the use of that method is arbitrary and capricious. *Public Service Corporation* v. *Public Service Commission,* 109 Wis. 2d 256, 263, 325 N.W.2d 867 (1982). The use of the "monthly annualized ROE" as a trigger in the September 4 order for requiring contributions to the ratepayers' fund is likewise arbitrary and capricious.

The second characteristic of the September 4 order—allowing CL&P no deduction for the months its monthly annualized ROE fell below 15.9 percent—is arbitrary

on its face. For practical purposes, it guarantees that CL&P cannot achieve earnings at the approved level because seasonal variations in company earnings invariably result in months when its ROE will be less than 15.9 percent. Thus, neither conceptually nor consequentially can this feature of the September 4 order be supported by reason, elemental fairness, nor settled principles of rate-making.

The obvious purpose of this one-way indexing—considering monthly earnings above but not below 15.9 percent—is to recoup, for the ratepayers, earnings above 15.9 percent realized by CL&P in the months prior to the September order. This the DPUC cannot do, for reasons that invalidate the third characteristic of the order. That characteristic—dedicating the ratepayers' fund to the purpose of reducing rates to be fixed in the pending rate application—flies in the face of well established principles of rate-making. Once rates are set by a regulating agency in accordance with statutory guidelines, the revenues realized belong to the company. The amount, if any, remaining after paying taxes, and operating expenses, including expenses of depreciation, is the company's compensation for the use of its property. *Board of Public Utility Commissioners* v. *New York Telephone Co.*, 271 U.S. 23, 31, 46 S. Ct. 363, 70 L. Ed. 808 (1926). The company both bears the loss below a reasonable return and retains the profit above a reasonable return. Id., 32.

Rate-making is necessarily present and prospective. *Mississippi Public Service Commission* v. *Home Telephone Co.*, 236 Miss. 444, 110 So. 2d 618 (1959). "Rates are established for the future and it is the generally accepted rule that retroactive rate-making is beyond the power of a regulatory commission. Past experience is, of course, an element in fixing rates and determining an allowable rate of return, but this does not mean that rates fixed for the future should be based upon

a higher or lower rate of return because of high earnings or low earnings in the past." E. Nichols & F. Welch, Ruling Principles of Utility Regulations, Rate of Return, Supplement A (1964) p. 315.

"It is generally held that neither losses sustained nor profit gained by a public utility in the past may be taken into account in fixing rates to be charged in the future." *Mississippi Public Service Commission* v. *Home Telephone Co.,* supra, 455; see also 64 Am. Jur. 2d, Public Utilities §§ 198, 199; *Re Potomac Electric Power Co.,* 83 PUR3d 209 (1970); *Re Connecticut Co.,* 38 PUR3D 282, 290 (1961).

Thus, in *Board of Public Utility Commissioners* v. *New York Telephone Co.,* supra, where a public service company had charged excessive depreciation and so created a reserve account balance greater than required adequately to maintain its property, the United States Supreme Court held the company could not be compelled to apply that excessive balance to overcome deficits in future earnings or to sustain rates which otherwise could not be sustained. The court said: "[T]he law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations." Id., 32.

More recently in *Petition of Elizabethtown Water Co.,* 205 N.J. Super., 528, 501 A.2d 567 (1985), the New Jersey regulatory agency delayed the effective date of a rate increase awarded a water company to compensate for company earnings in excess of the previously approved rate of return in prior years. The New Jersey Appellate Division reversed on the ground that the delay amounted to retroactive rate-making and held that "this rule against retroactive ratemaking may work for as well as against a utility . . ." Id., 537. One judge in that case dissented on the ground that the rule against retroactive rate-making should apply only when

it protected ratepayers and not utilities. The Supreme Court of Rhode Island, in *Narragansett Electric Co.* v. *Burke*, 505 A.2d 1147 (R.I. 1986), came to the same conclusion, on the ground that the policy against retroactive rate-making was to protect the public against future rates being used to recoup a company's past losses.

This court finds, however, that the majority, and by far the better, rule is to apply the prohibition against retroactive rate-making both in favor of as well as against the utility company.

When the DPUC discovers that a public service company is earning at levels higher than it found in its last rate proceeding to be fair and reasonable, it can make certain adjustments. It can, as indicated above, determine that a rule deferring a portion of current operating expenses, such as fuel costs, should be terminated and all those expenses should be paid out of current revenue. But it cannot snatch from the company's investors' earnings derived from approved rates, even if in excess of a fair return in equity, and dedicate them to the company's customers. If it wants to achieve that objective, the DPUC must change the rates giving rise to that level of earnings.

The plaintiff also appealed from both of the orders on the ground that they exceeded the scope of the notice of the hearings. This court finds no merit in this contention.

On the basis of the foregoing, the plaintiff's appeal from the order of April 4, 1985, and the decision of the DPUC denying the plaintiff's petition to rescind that order is dismissed. The plaintiff's appeal from the order of September 4, 1985, and the decision of the DPUC denying the plaintiff's petition to rescind that order is sustained.