605 So.2d 796 (1992)
SOUTHEAST MISSISSIPPI LEGAL SERVICES CORPORATION, Mississippi Legal Services Coalition, General Motors Corporation, Peavey Electronics Company
v.
MISSISSIPPI POWER COMPANY.
No. 90-CC-0948.
Supreme Court of Mississippi.
August 12, 1992.
John C. Jopling, Hattiesburg, Bob Arentson, John H. Holloman, III, Watkins, Ludlam & Stennis, Jackson, for appellants.
Ben H. Stone, James S. Eaton, H.R. Wilder, Keith T. Hill, Eaton & Cottrell, Gulfport, for appellee.
En Banc.

ON PETITION FOR REHEARING
ROBERTSON, Justice, for the Court:

I.
Today's appellants are electricity consumers and their representatives, and they seek judicial review of an administrative order finding a power company's rate increases "not to exceed rates which are just and reasonable." Appellants present substantive and procedural objections to the order below, none of which possess power that we might strike it. We affirm.

II.
Mississippi Power Company ("MPC") is a public utility engaged in the business of providing electric service to and for the public for compensation in Southeast Mississippi. *797 MPC has its principal place of business in Gulfport, Mississippi, and holds a certificate of public convenience and necessity authorizing it to operate in portions of twenty-three counties.
In 1986, MPC perceived that it was in need of a rate increase and, rather than pursuing the normal and customary processes, proposed to the Mississippi Public Service Commission a performance-based, formula-type rate plan which it labeled Performance Evaluation Plan (PEP). By order of August 17, 1986, the Mississippi Public Service Commission ("the Commission") adopted the PEP as the authorized method for setting MPC's rates. Various parties  including today's appellants  objected and appealed to this Court, which reversed. State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d 367 (Miss. 1989). We held that the Mississippi Public Utility Regulatory Act as it then read, Miss. Code Ann. §§ 77-3-1, et seq. (1972 and Supp. 1986), did not authorize the Commission to approve any such formula-type rate adjustment plan.
In the wake of this action, MPC resorted to more conventional processes. On April 13, 1990, the MPC filed with the Commission a Notice of Intent to Increase Rates. This notice was contained in docket number 90-UN-0127 (0127) and asked for a 1.8% increase over the rates previously approved by the Commission back in May of 1982. The requested increase in 0127 was to become effective as of May 17, 1990 and was projected to result in a total revenue increase of $5.6 million.
But three days later, April 16, 1990, the MPC filed with the Commission another Notice of Intent to Increase Rates in docket number 90-UN-0128 (0128). This asked a 1.9% rate increase from the rates proposed in 0127, and was to become effective as of May 18, 1990. Revenue increases were projected at $6.0 million.
Those who had objected to the PEP sprang into action. The Attorney General promptly filed with the Commission his Notice of Intervention. On April 20, 1990, General Motors Corporation ("GMC") filed its Petition to Intervene. A week later, on April 27, 1990, these were joined by two more PEP opponents, the Southeast Mississippi Legal Services Corporation and the Mississippi Legal Services Coalition (collectively "Legal Services"). The following week, May 4, 1990, Peavey Electronics Corporation ("Peavey"), filed a Petition to Intervene.
In the meantime, the Commission ordered consolidated the proceedings in docket numbers 0127 and 0128, and on May 14, 1990, the Commission issued an Order Suspending Rates and Setting Hearing Schedule, this to be done no less than 60 days after the notices were filed by the MPC.
In time, the Attorney General made his peace with MPC and when the Commission convened for hearing on June 6, 1990, the power company offered a stipulation joined by the Attorney General and the Commission staff, the bottom line of which was a collective opinion that the rates MPC proposed were just and reasonable.[1] The hearing went forward with MPC offering, in addition to the stipulation, the testimony of its comptroller and numerous exhibits. Contestants GMC, Peavey and Legal Services cross-examined but offered no proof of their own. On June 22, 1990, the Commission entered its unanimous order, making extensive findings and approving the rate proposed in No. 90-UN-0128, dismissing No. 90-UN-0127, and lifting its suspension of those rates and finally providing, "The rates shall be effective with respect to service rendered from and after the date of this order."
GMC, Peavey and Legal Services now appeal to this Court.

*798 III.
Our scope of review of orders of the Public Service Commission is important and as limited as it is familiar. We begin with the premise that the Commission "is an arm of the legislature." State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d 387, 394 (Miss. 1989); Mississippi Public Service Commission v. South Central Bell Telephone Co., 464 So.2d 1133, 1134 (Miss. 1984) (citing cases). As a corollary, we have long accepted that "the rate-making function is legislative in character." Pittman, 538 So.2d at 394; South Hinds Water Co. v. Mississippi Public Service Commission, 422 So.2d 275, 281 (Miss. 1982); Mississippi Public Service Commission v. Home Telephone Co., 236 Miss. 444, 461, 110 So.2d 618, 626 (1959). The Commission acts on legislative facts and proceeds in a manner like unto a legislature.
By law we are told Commission orders shall not be vacated or set aside either in whole or part, except for errors of law, unless the Court finds that the order of the Commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the Commission, or violates constitutional rights.
Miss. Code Ann. § 77-3-72(4) (Supp. 1990). This is essentially a restatement of generally prevailing limits on judicial review of administrative agency action. See, e.g., Wright v. State Oil & Gas Board, 532 So.2d 567, 570 (Miss. 1988); Melody Manor Convalescent Center v. Mississippi State Department of Health, 546 So.2d 972, 974 (Miss. 1989); Mississippi State Tax Commission v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss. 1969).
Miss. Code Ann. § 77-3-33(1) (1972) mandates that utility rates should not "exceed that which is just and reasonable." We have read this to say the Commission is not bound to use any particular formula in enforcing this statutory mandate. State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d 367, 372 (Miss. 1989); Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 113 So.2d 622, 647-49 (1959). By law, rates must be sufficient to "yield a fair rate of return to the public utility for furnishing service to the public... ." Miss. Code Ann. § 77-3-33(1) (1972) and § 77-3-39(5) (Supp. 1990).
The reasonableness of rates charged, or to be charged, by a public utility is not determined by definite rules and legal formulae, but is a fact question requiring the exercise of sound discretion and independent judgment in each case.
Pittman, 538 So.2d at 372 (citing cases). A legislative fact question, if you will.
On judicial review, we seek the bottom line; some would say "the end result." The component parts of the utility's rate base calculations come under our eye only as they push the end result in excess of that which is just and reasonable. This rule obtains in utility rate-making across the nation.
If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.
Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, 1049-50 (1942).
It is not the theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the act is at an end.
Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944).
This Court has accepted these principles as early as Southern Bell Telephone & Telegraph Co. v. Mississippi Public Service Commission, 237 Miss. 157, 224, 113 So.2d 622, 647 (1959) ("It is the end result reached, not the method employed which is controlling... ."). To like effect is Mississippi Power Company v. Mississippi Public Service Commission, 291 So.2d 541, 555 (Miss. 1974). See also, State ex rel. Pittman v. Mississippi Public Service Commission, 538 So.2d at 372.

*799 IV.
Legal Services complains cynically that MPC gave its first notice in No. 90-UN-0127 on April 13, 1990, asking a 1.8 percent increase, and then three days later, on April 16, 1990, filed its notice in No. 90-UN-0128, asking another 1.9 percent increase. Of course, nothing in the Public Utility Regulatory Act strips a utility of its right to initiate rate changes at will. The law requires only that the appropriate notice be given and that the processes of the Commission be respected thereafter.
MPC's course certainly suggests the company may have thought this one step, two step ploy might avoid a full rate case hearing. Miss. Code Ann. § 77-3-39(1) (1972) in relevant part requires a full hearing in the case of changes in rates constituting "a major change." Miss. Code Ann. § 77-3-37(8) (1972) provides:
"Major changes" means (a) an increase in rates which would increase the annual revenues of such public utility more than the greater of one hundred thousand dollars ($100,000.00) or two percent (2%).
All of this comes to naught, as the Commission order makes clear it proceeded on the assumption "that the two notices constitute a major change ..."[2] The Commission recited further:
The company has thus complied with all filing requirements even if the change due to both filings constitutes a "major change" and the Commission has conducted a full evidentiary hearing as required by the statute.

V.
The rates for which MPC sought sanction coincided with its rates for the last quarter it operated under PEP. The record reflects, without dispute, that, for the twelve months ending December 31, 1989, at the rates in effect as determined in 1982, pursuant to order in docket U-4190, the earned retail return on equity of MPC was 7.966 percent. Under the rate increase presently at issue for that same period, MPC's reading of its return would have been 9.464 percent. W.E. Gilmore, MPC's comptroller, testified that these rates were below what would be considered just and reasonable. No other party offered evidence. Indeed, the Commission order recites:
The company, staff and all intervenors have appeared by counsel and have been given full opportunity to present their case. Only the company chose to offer evidence.
Notwithstanding, Appellants challenge these computations and rates on two points. They say the proposed rates would allocate to cost of service fifty percent of all charitable contributions, and would credit only seventy-five percent of firm capacity sales to rate payers. It is certainly true that in our decision in the PEP case, we criticized MPC at these points, Pittman, 538 So.2d at 375, but that was in the context of whether PEP was a statutorily permissible process. On reflection, Appellants' point vanishes. MPC has not sought permanent sanction for any accounting allocation of firm capacity sales or charitable contributions. What  and all  they have done is use, as their test year, the year ending December 31, 1989. In 1989, firm capacity sales and charitable contributions under PEP were allocated as noted. To the point, the Commission had before it a stipulation between staff, the Attorney General, and MPC that, even with these two adjustments
such an adjustment would increase the rate of return to a figure which would be less than the 11.33 percent return on equity allowed and found to be fair and reasonable in the company's last performance evaluation plan (PEP) rate adjustment, which took effect March 26, 1990.
The Commission found that even with these adjustments, these rates are "within the range that should be considered just and reasonable." Substantial evidence supports this finding.[3] The end result is still *800 rates that do not "exceed rates which are just and reasonable."

VI.
Appellants claim they were denied procedural rights and that, in their view, MPC did not provide adequate responses to their data requests. They suggest that MPC made its pre-hearing discovery responses only to the intervenor requesting the data and not to all. The record reflects that MPC responded fully to formal discovery and additionally, responded to numerous informal, usually verbal, questions from the parties.
It is undisputed that, prior to the hearing of this matter, MPC provided to General Motors ten sets of documents, including (1) support documents for the 9.464% return on equity; (2) copy of MPC's FERC Form 1 for the years 1986-89; (3) MPC's 1989 financial and statistical review; (4) copies of three sets of rate schedules; (5) fuel adjustment clause factors from 1982 to present; (6) an analysis of the change in revenue levels; (7) schedule of new non-fmr capacity sales; (8) a schedule of accruals and cash payments regarding retirement programs, past retirement benefits, and vacation pay; (9) a schedule of average revenue since per kilowatt hour by customer class from 1986 to 1989; and, (10) a description of the method used to calculate construction work in progress and AFC in the filing. [R. Vol. 1, p. 108]. The Attorney General's office received the following documents: (1) support documents for the 9.464% return on equities; (2) kilowatt hour billing determinations used to calculate revenues for 1989; (3) credit watch notification from Standard & Poors and Duff & Phelps; (4) MPC's 1989 annual report; (5) a copy of the MPC PEP quarterly filings for 1986 and 1989; (6) a copy of MPC's monthly operating reports for December 1985 through 1989 and March 1990; (7) a complete copy of the most current MPC capital and operating budgets for the year 1990; (8) the 1987 cost of service study and MPC's revised 1987 cost of service studies; and, (9) the average retail revenue per kilowatt hour for 1986 through 1989.
Legal Services, however, claims it did not get all of these documents and that it received only the single set of documents supporting the 9.464 percent return on equity. Legal Services suggests that they were severely disadvantaged by this failure to supply documents and that we should reverse.
Miss. Code Ann. § 77-3-37(7) provides:
At the time of filing direct testimony, exhibits and other information, each party filing such documentation shall serve copies of the documentation on all other parties of record and shall file a certificate of service with the Commission.
MPSC Rules of Practice and Procedure, 6(P)(1) and (2), provides:
(1) Service of Copies. Copies of any data requests filed by any parties shall be provided to all other parties to the proceedings including but not limited to one copy to be filed with the Executive Secretary of the Commission *801 and one copy to be filed with the Public Utilities Staff.
(2) Responses. Where practical, all parties shall be provided with a copy of all responses to data requests. Where compliance with this Rule would be unreasonably burdensome to the responding party, the requesting party and the Public Utility Staff shall be provided with a copy of the response and all other parties shall be provided with notice of the response and a reasonable opportunity to obtain or review a copy of the response.
In the case at bar, MPC did in fact file with the Executive Secretary responses to data requests, in addition to the responses noted above.
The error, if any, is harmless. These Appellants had been MPC's adversaries regarding its rates at least since 1986, and the Commission was well within its discretion in assuming the parties were familiar with the relevant books and records. Legal Services did not raise the issue until it moved the Commission for reconsideration and neither there nor here did it suggest how it was prejudiced by the failure of service of the documents in question.
The Commission recited that it had
afforded the intervenors a full opportunity to conduct an investigation of the filing, and it is uncontested that General Motors and Peavey have obtained all the information which they have requested from the company [with an exception to be noted below]... .
A plenary hearing was held in which all parties could present any relevant evidence. Neither General Motors, Peavey, nor Legal Services offered any evidence that MPC's proposed rates exceeded what was just and reasonable. Nothing in Legal Services' present claim undermines our confidence in the substance or integrity of the final order. In civil litigation parlance, the error is at most harmless. Given our limited judicial review, see Section 77-3-72(4) and Part III above, we have no authority to intervene.

VII.
General Motors and Peavey claim error in the Commission's refusal to order disclosure of the company's overall rate classification and structure. This appears to concern the matter of MPC charging different classes of customers different rates. The Commission held this document irrelevant "since it does not relate to the company's overall return but only to the company's rate structure which is not an issue in this proceeding." We agree. The fact that MPC may have been charging corporate customers rates in excess of those charged to ordinary consumers, if that has been the case, was not an issue in the present proceeding. Of course, our action here is wholly without prejudice to the rights, if any, of GMC and Peavey to press the present point in other appropriate proceedings.

VIII.
Finally, Legal Services complains that it was improperly restricted in cross-examining MPC comptroller W.E. Gilmore. Legal Services' announced purpose was to show that Gilmore was not an objective witness and, to that end, sought to ask a series of detailed questions about Gilmore's financial and legal ties to the company. The Commission rejected this line of questioning as irrelevant, although Commission Chairman Cochran stated:
Well, I would have to assume that if he's employed by the company, he is going to be a little biased toward the company that draws his check.
That assumption made, the Commission was well within its discretion in stopping the attack right there.
PETITION FOR REHEARING DENIED; MOTION FOR CLARIFICATION OR CORRECTION GRANTED IN PART, DENIED IN PART; OPINION MODIFIED; AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PITTMAN and BANKS, JJ., concur.
*802 DAN M. LEE, P.J., and SULLIVAN and McRAE, JJ., dissent.
PRATHER, J., not participating.
NOTES
[1] At the hearing the Attorney General announced his office had retained "Tom Weiss, who the Commission is familiar with" and who "did his own independent analyses." The Attorney General represented Weiss' "bottom line ... indicated that the rates as filed by the Company were within a range of what was just and reasonable," by reason whereof the Attorney General joined the stipulation.
[2] This modifies the Commission Chairman's preliminary ruling at the hearing that, "It is a regular hearing ... [and] not an abbreviated type of scenario."
[3] The full text of the Commission's recitation reads:

The Company has filed data and documentation with its Notice by which it attempts to establish that the proposed rates will yield a 9.464 percent return on equity using a pro forma test year which is based on historical 1989 information with revenues restated by applying the proposed rates to the actual billing determinants for 1989. The only adjustments which the Company proposes to actual 1989 expenses are for income taxes and municipal franchise taxes which would be occasioned by the revenue generated from the proposed rates. The Company's filing has been reviewed by the Public Utilities Staff and by experts retained by the Attorney General and by General Motors and Peavey. Both the Staff and the Attorney General propose a number of changes which would increase the return to be earned by the Company. Two of those changes are the elimination of the crediting of 25% of new, non-firm capacity sales to the Company's stockholders and the elimination of expenses in cost of service associated with 50% of the Company's charitable contributions. Even making all of these adjustments, both the Staff and the Attorney General agree that the Company's return on equity and return on rate base under these rates are within the range that should be considered just and reasonable. Accordingly, the Staff and Attorney General stipulated that the rates did not exceed those which are just and reasonable and that the rates proposed in docket 90-UN-0128 should be allowed to go into effect.